UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 0:21-cv-61848

Jim Antonio Alers, on his own behalf,
and on behalf of those similarly situated,

       Plaintiff(s)                               **CLASS ACTION**

v

ROBINHOOD FINANCIAL, LLC,
CITADEL SECURITIES, LLC,
APEX CLEARING CORPORATION,
TWO SIGNA SECURITIES, LLC,
WOLVERINE SECURITIES, LLC, and
VIRTU FINANCIAL, INC.,

       Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiff, Jim Antonio Alers ("Plaintiff" or "Mr. Alers"), on his own behalf and on behalf of those similarly situated (collectively, the "Customers" or "Class Members"), by and through undersigned counsel, sues Defendant Robinhood Financial, LLC. ("Robinhood"), and Defendants Citadel Securities, LLC ("Citadel"), Apex Clearing Corporation ("Apex"), Two Signa Securities, LLC ("Two Signa"), Wolverine Securities, LLC ("Wolverine"), Virtu Financial, Inc. ("Virtu"), and alleges the following based upon personal knowledge as to the allegations regarding himself, and upon information and belief as to the other allegations:

### PARTIES

1.      Plaintiff is a resident of Broward County and otherwise *sui juris*.

2.      Robinhood is a Delaware LLC with its principal place of business in Menlo Park, California. It offers self-directed securities brokerage services to customers by means of its website

and smartphone applications. Robinhood is a Commission-registered broker-dealer and a member of FINRA.

3.     Robinhood was founded in 2013 and began offering retail brokerage accounts to the general public in March 2015. Robinhood distinguished itself from other retail-oriented broker-dealers by, among other things, allowing customers to place orders to buy and sell securities without paying a trading commission. By June 2019, Robinhood had 9 million approved customer accounts. Robinhood is currently authorized to do business in all 50 States, Washington DC, the US Virgin Islands, and the Commonwealth of Puerto Rico.

4.     Defendant Citadel Securities, LLC is a principal trading firm, also known as an "electronic market maker," with a primary place of business in Chicago, IL.

5.     Defendant Apex Clearing Corporation is a principal trading firm, also known as an "electronic market maker," with a primary place of business in Dallas, TX.

6.     Two Signa Securities, LLC is a principal trading firm, also known as an "electronic market maker," with a principal place of business in NY, NY.

7.     Wolverine Securities, LLC is a principal trading firm, also known as an "electronic market maker," with a principal place of business in Chicago, IL.

8.     Virtu Financial, Inc. is a principal trading firm, also known as an "electronic market maker," with a principal place of business in NY, NY.

9.     Together, these five Defendants will be referred to here as the market maker Defendants.

**JURISDICTION AND VENUE**

10.     This action is based on diversity, federal laws, and Plaintiff seeks the recovery of damages in excess of the jurisdictional amounts required for this Court.

11.     This Honorable Court has subject matter jurisdiction over Plaintiff's claims based upon federal questions jurisdiction, 28 U.S.C. § 1331.

12.     Venue is proper as facts giving rise to this action occurred in this district.

~~12.~~13.  Additionally, venue is proper in this district because the Plaintiff, and the majority of the putative class resided in Florida at the time that they signed up for the Defendant's services, most of the trades conducted by the Plaintiff and the putative class initiated from Florida, and a substantial majority of the funds deposited by the Plaintiff and the putative class originated from banking institutions located in Florida.

## INTRODUCTION

~~13.~~14.  In perhaps the most dramatic twist of irony, Robinhood, whose namesake is shared with the endearing fairytale hero who stole from the rich to give to the poor, has profited billions from its unsuspecting consumers to engage in less favorable trades from its curated list of  principal trading firms, also known as electronic market makers, without first disclosing that its primary revenue source comes to the disadvantage of these same customers.

~~14.~~15.  In or around May 2016, Robinhood began negotiations with a number of principal trading firms about potentially routing Robinhood customer orders to those entities. In the course of those negotiations, certain of the principal trading firms told Robinhood that there was a trade-off between payment for order flow on the one hand and price improvement on the other: If Robinhood negotiated for higher payment for order flow revenue, according to the principal trading firms, there would be less money available for the principal trading firms to provide price improvement to Robinhood's customers.

~~15.~~16.  This action concerns Robinhood and certain hand-picked market-makers engaging in an agreement to profit at the expense of Robinhood's duties to its customers. ~~concerns the material~~

misrepresentations and omissions made by Robinhood relating to its customers regarding its revenue sources, specifically its receipt of payments from certain principal trading firms, for routing Robinhood customer orders to them, and relating to certain false statements about the execution quality Robinhood achieved for its customers' orders.  It also involves Robinhood's failure to satisfy its duty of best execution.

16.17.  Robinhood launched its retail brokerage business in 2015.  By mid-2018, it was one of the largest retail broker-dealers in the United States.

17.18.  One of Robinhood's primary selling points was that it did not charge its customers trading commissions. What Robinhood's customers were not advised was that its purported "commission free" trading came with a hefty price: Robinhood's customers received inferior execution prices compared to what they would have received from Robinhood's competitors. For larger value orders (or volume orders), this price difference at Robinhood exceeded the commission its competitors would have charged. These inferior prices were caused in large part by the unusually high amounts Robinhood charged the principal trading firms for the opportunity to obtain Robinhood's customer order flow.  These payments are generally referred to as "payment for order flow."

18.    From 2015 through September 2018, certain of Robinhood's retail communications omitted its receipt of payment for order flow, ostensibly so that this information could not be ascertained by the public.  Yet, since Robinhood's launch, payment for order flow has been Robinhood's single largest source of revenue.

19.    Instead of transparent disclosure, Robinhood created a veneer within its customer agreements and trade confirmations by stating it "may" receive payment for order flow and disclosed certain information about those payments as required in its SEC-mandated Rule 606 reports.

~~However, in FAQs section of its website describing how it made money, and in certain communications with customers addressing the same issue, Robinhood omitted payment for order flow when it described its revenue sources because it believed that payment for order flow might be viewed as controversial by customers. Robinhood further instructed its customer service representatives not to mention payment for order flow in responding to questions about Robinhood's sources of revenue.~~

~~20.~~19.  As of~~In~~ October 2018, ~~after media outlets raised questions about whether Robinhood's payment for order flow rates negatively affected the execution prices that Robinhood customers received on their orders, Robinhood responded by claiming as part of an FAQ page on its website that its order execution quality matched or beat that of its competitors. However, at that time,~~ Robinhood had begun comparing Robinhood's execution quality to competitors' and was aware it was worse in many respects.  By March 2019, Robinhood had conducted a more extensive internalanalysis that found Robinhood's execution quality and price improvement metrics were substantially worse than other retail broker-dealers' in many respects, and senior Robinhood personnel were aware of this analysis. As of the date of the filing of this Action, Robinhood has done nothing to remedy the breaches of their fiduciary duty to their customers. Even the claim about Robinhood's execution quality matching or beating its competitors was not removed from its website until June 2019.

~~21.~~20.   As a broker-dealer that routed customer orders for execution, Robinhood had a duty to seek to obtain the best reasonably available terms for customers' orders. This duty is referred to as the duty of "best execution."

~~22.~~21.  From September 2016 through June 2019, while Robinhood was on notice that its high payment for order flow rates from principal trading firms could result in inferior execution prices for its customers, Robinhood violated its duty of best execution by failing to conduct adequate

regular and rigorous reviews of the execution quality it was providing on customer orders. Robinhood did not begin comparing its execution quality to that of its competitors until October 2018 and did not take appropriate steps during the entire period to assess whether its higher payment for order flow rates were adversely affecting customer execution prices.

<u>**FACTUAL ALLEGATIONS**</u>

a. **Robinhood Makes its Most Substantial Revenue Through Order Flow**

~~23.~~22.  Rather than sending customer orders to buy or sell equity securities directly to national exchanges, Robinhood, like other retail broker-dealers, routed its orders to other broker-dealers (often referred to as "principal trading firms" or "electronic market makers") to either execute those orders or route them to other market centers. Principal trading firms attempt to profit from executing large volumes of retail buy and sell orders either by taking the other side of customer orders and exiting the positions at a profit, which is also known as "internalization," or by routing the orders to other market centers.

~~24.~~23.  Principal trading firms offer incentives to retail broker-dealers to send them order flow. One such incentive is "payment for order flow," which is defined in Rule 10b-10(d)(8) of the Exchange Act to include any monetary payment, service, property, or other benefit that results in remuneration, compensation, or consideration to a broker-dealer in return for the routing of customer orders. Since it began operating as a broker-dealer, Robinhood, like other retail broker-dealers, has received payment for order flow in exchange for routing its customer orders to principal trading firms.

~~25.~~24.  The receipt of payment for order flow by broker-dealers such as Robinhood is not by itself a violation of a broker-dealer's fiduciary duty as long as it does not interfere with the broker-dealer's efforts to obtain best execution for its customers~~, and as long as the routing of the customer~~

~~order flows, as well as a description of all terms of any such arrangements that may influence the broker-dealer's order routing decisions, are disclosed appropriate to the broker-dealer's customers, which Robinhood failed to do as the customer fiduciary.~~

26.25.  Another incentive that principal trading firms may provide to retail broker-dealers is "price improvement" on customer executions. Price improvement occurs when a customer order receives an execution at a price that is superior to the best available quotation then appearing on the public quotation feed, that is, by executing a "buy" order at a price lower than the lowest prevailing offer or executing a "sell" order at a price higher than the highest prevailing bid. Price improvement creates a financial benefit for the customer, since the customer receives a better price than they would have received had the order been executed at the national best bid and offer ("NBBO") on the public quotation feed. In practice, most retail broker-dealers obtain price improvement on the vast majority of customer orders that they send to principal trading firms.

**b. Robinhood Curates a List of Principle Trading Firms Despite its Duty of Best Execution.**

27.26.  Broker-dealers such as Robinhood owe their customers a duty of "best execution." Best execution requires that a broker-dealer endeavor to execute customer orders on the most favorable terms reasonably available in the market under the circumstances. This includes taking into account price, order size, trading characteristics of the security, as well as the potential for price improvement and other factors. See *Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 135 F.3d 266, 270 & n.2 (3d Cir. 1998); Marc N. Geman, Securities Exchange Act Release No. 43963 (Feb. 14, 2001) (Commission opinion). Although a broker-dealer is not required to examine every customer order individually for compliance with its duty of best execution, it must undertake regular and rigorous reviews of the quality of its customer order executions. See Payment for Order Flow,

Securities and Exchange Commission Final Rule Release, Exchange Act Release No. 34902, 59 Fed.

Reg. 55006, at 55009 (Oct. 27, 1994) ("Payment for Order Flow Release").

28.27.   The duty of best execution derives from, among other sources, the common law

agency duty of loyalty, which obligates an agent to act exclusively in the principal's best interest.

Payment for order flow has the potential to create a conflict of interest between the broker-dealer

and its customer because payment for order flow is a benefit that goes to the broker-dealer itself,

whereas other incentives that may be obtained for routing order flow, such as price improvement,

benefit the broker-dealer's customers. A broker-dealer must not allow payment for order flow to

interfere with its efforts to obtain best execution. See Payment for Order Flow Release, at 55009 &

n.28.

***Robinhood's Initial Public Messaging Concerning Payment for Order Flow***

28.   In 2014, prior to its public launch, Robinhood published an FAQ on its website

providing information about the company and its anticipated brokerage operations. The first version

of the FAQ disclosed that Robinhood anticipated receiving payment for order flow in its answer to

the question "How does Robinhood make money?"

28.   Also in 2014, a best-selling author published a book that chronicled various aspects

of the electronic securities trading industry and portrayed payment for order flow as a controversial

practice. Several news organizations also published articles discussing payment for order flow and

other issues concerning electronic trading venues. Senior Robinhood personnel were aware of these

publications and the ensuing controversy regarding payment for order flow and its association with

principal trading firms (which were also sometimes referred to as "high frequency trading firms").

They became concerned that if the public associated Robinhood with payment for order flow and

high frequency trading firms, it could be viewed as controversial by Robinhood's customers.

28.    ~~In light of these concerns, in December 2014, Robinhood removed the reference to payment for order flow from its answer to the "How does Robinhood make money" FAQ and created a new FAQ page that specifically discussed payment for order flow. This new FAQ page stated that the payment for order flow revenue Robinhood received at the time was "indirect" and "negligible." It also stated that if payment for order flow ever became a direct or significant source of revenue, Robinhood would inform customers of those facts on the "How does Robinhood make money" FAQ page.~~

28.    ~~In the first quarter of 2015, Robinhood launched its trading platform to the public. Although the company's overall revenue was modest in 2015 through mid-2016, during that time payment for order flow comprised more than 80% of the company's revenue.~~

**~~b.~~c.    Robinhood Received Unusually High Payment for Order Flow Rates.**

~~29.~~28.    Initially, Robinhood relied on another broker-dealer to provide both clearing and order execution services for Robinhood customer orders. That broker-dealer routed Robinhood customer orders to principal trading firms, received payment for order flow in return, and shared a portion of that payment for order flow with Robinhood.

~~30.~~29.    During the first half of 2016, Robinhood decided to start routing customer orders directly to principal trading firms and cease relying on the other broker-dealer for order execution routing services. By doing so, Robinhood could earn additional payment for order flow revenue.

~~31.~~30.    In or around May 2016, Robinhood began negotiations with a number of principal trading firms about potentially routing Robinhood customer orders to those entities. In the course of those negotiations, certain of the principal trading firms told Robinhood that there was a trade-off between payment for order flow on the one hand and price improvement on the other: If Robinhood negotiated for higher payment for order flow revenue, according to the principal trading firms, there

would be less money available for the principal trading firms to provide price improvement to Robinhood's customers.

32.31.  At least one principal trading firm communicated to Robinhood that large retail broker-dealers that receive payment for order flow typically receive four times as much price improvement for customers than they do payment for order flow for themselves—an 80/20 split of the value between price improvement and payment for order flow.

33.32.  Robinhood negotiated a payment for order flow rate that was substantially higher than the rate the principal trading firms paid to other retail broker-dealers—which resulted in approximately a 20/80 split of the value between price improvement and payment for order flow. Robinhood explicitly offered to accept less price improvement for its customers than what the principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself.

34.33.  In September 2016, Robinhood began routing customer orders directly and solely to principal trading firms. Around the same time, Robinhood formed a "Best Execution Committee" to monitor the speed and the prices at which the principal trading firms were executing Robinhood customer orders. The Committee met at least once per month and included Robinhood's General Counsel.

35.34.  From October 2016 through at least June 2019, the Committee observed that Robinhood was not obtaining much price improvement on its customer orders in equity securities, particularly on orders of 100 shares or more.

36.35.  Meanwhile, in 2017, Robinhood developed a proprietary routing algorithm, known as a smart order router, designed to make the principal trading firms with which Robinhood had payment for order flow arrangements compete for order flow by routing customer orders to the

principal trading firm that had provided the most price improvement for that stock over the prior 30 days. However, the smart order router did not address Robinhood's high payment for order flow rates or any potential execution prices that may be available at venues that did not agree to pay those rates. Even with its smart order router, Robinhood customer orders received poor execution quality.

37.36.  Although Robinhood was on notice that its high payment for order flow rates could lead to less price improvement, the Best Execution Committee did not conduct adequate regular and rigorous reviews to ensure that Robinhood was satisfying its best execution obligations. The Committee took no steps to determine whether Robinhood's payment for order flow rates were having a negative impact on the execution prices that Robinhood's customers received. Until October 2018, the Committee did not consider how Robinhood's price improvement statistics compared to those of other retail broker-dealers, or to the retail order execution market generally.

38.37.  In mid-2017, when one of the principal trading firms to which Robinhood routed order flow told Robinhood it would no longer agree to pay Robinhood's unusually high payment for order flow rates but would pay a lower payment for order flow rate, Robinhood stopped routing customer orders to that principal trading firm.

39.38.  When certain Robinhood personnel began comparing the firm's order execution quality to competitors in October 2018, they learned that for most execution quality metrics, including the percentage of orders receiving price improvement, Robinhood's execution quality was worse.

40.39.  By March 2019, Robinhood had conducted a more extensive internal analysis, which showed that its execution quality and price improvement metrics were substantially worse than other retail broker-dealers in many respects, including the percentage of orders that received price improvement and the amount of price improvement, measured on a per order, per share, and per

dollar traded basis. Senior Robinhood personnel were aware of this analysis.

41.40.  However, Robinhood's Best Execution Committee did not take and have not taken appropriate steps to assess whether, in light of this information, Robinhood was complying with its duty to seek best execution of customer orders.

42.41.  Robinhood's failure from October 2016 through today to conduct adequate regular and rigorous reviews that involved benchmarking its execution quality against competitor broker-dealers to determine whether it was obtaining the best terms reasonably available for customer orders, violated the firm's duty of best execution, and thus violated their fiduciary responsibilities to Robinhood's customers.

qq.    Robinhood Misleadingly Omitted Payment for Order Flow From Descriptions of Its Revenue Sources

44.    By the end of 2016, Robinhood was generating a significant amount of revenue, the majority of which its controlling officers knew continued to come from payment for order flow. However, contrary to what the company had said in the payment for order flow FAQ, Robinhood did not disclose the new payment for order flow arrangements in its answer to the "How Robinhood Makes Money" FAQ on its website. Instead, at some point during 2016, Robinhood deleted the payment for order flow FAQ. Robinhood kept no records showing when the payment for order flow FAQ was deleted, why it was deleted, or who was responsible for approving its removal.

45.    Between late 2016 and September 2018, Robinhood continued to grow rapidly. Although payment for order flow remained the company's largest revenue source throughout this period, Robinhood did not include payment for order flow as a revenue source in its answer to the "How Robinhood Makes Money" FAQ on its website. The company failed to update the FAQ to include payment for order flow despite the fact that, in 2016 and 2017, the company did update the

Formatted: Highlight

~~FAQ to include two other, smaller revenue sources: subscription-based memberships and interest on securities lending. The version of the "How Robinhood Makes Money" FAQ page that was posted on Robinhood's website from approximately April 2017 through September 2018 stated:~~



~~49.     Robinhood kept incomplete records of its updates to the "How Robinhood Makes Money" FAQ page, including incomplete records of who was responsible for approving updates to that page.~~

50.    The "How Robinhood Makes Money" FAQ was featured in certain of Robinhood's customer communications. From at least February 22, 2016, to October 26, 2017, Robinhood displayed a link to the "How Robinhood Makes Money" FAQ on the home page of its website:



52.    Moreover, Robinhood instructed customer service representatives to direct customers to the "How Robinhood Makes Money" FAQ page or use the language of the misleading FAQ answer when responding to general questions about how Robinhood made money. Thus, in response to inquiries from its customers between 2015 and August 2018 about how Robinhood made money — approximately 150 inquiries in total — Robinhood's customer service representatives did not identify payment for order flow as one of the company's revenue sources. Training documents for customer service representatives in early 2018 explicitly instructed them to "avoid" talking about payment for order flow and stated that it was "incorrect" to identify payment for order flow in

~~response to the question how Robinhood makes money.~~

~~53.    Throughout this period, Robinhood disclosed some information about its receipt of payment for order flow as required in SEC-mandated reports pursuant to Rule 606. The company included these reports on the "Disclosure Library" page on its website that included a number of other legally mandated disclosures. However, the company did not feature the "Disclosure Library" or the reports contained in that library prominently in its communication strategy, like it did with the "How Robinhood Makes Money" FAQ page. Robinhood's customer agreements and trade confirmations stated that Robinhood "may" receive payment for order flow.~~

~~bbb.~~   **Robinhood~~'s~~ Falsely Claimed That Its Execution Quality ~~Matches or Beats~~Was Worse Than That of Its Competitors**

~~55.~~d.   ~~In response to media reports in September and October 2018 about Robinhood's payment for order flow rates, Robinhood added payment for order flow to the list of revenue sources appearing on the "How Robinhood Makes Money" FAQ page. But on October 12, 2018, it also published a new FAQ page that discussed payment for order flow and Robinhood's order execution quality. The new FAQ page stated that Robinhood's "execution quality and speed matches or beats what's found at other major brokerages." It also cited one statistic related to execution speed and one statistic related to the percentage of orders for S&P 500 stocks executed within the NBBO.~~

> **What is the execution quality for orders on Robinhood?**
>
> Reg NMS ensures your order gets executed at the national best bid and offer, or better, at the time of execution. Our execution quality and speed matches or beats what's found at other major brokerages. Even when measured at the time of routing, our customers' orders get executed at the NBBO or better. By way of example, in August 2018, 99.12% of our customers' marketable orders were executed at the the national best bid and offer or better with an execution speed of 0.08 seconds from routing to execution (for S&P 500 stocks, during market hours).

~~56.~~42.   ~~However, the internal analyses referenced in paragraphs 28-29 above that Robinhood conducted in~~By October 2018 ~~and March 2019~~, Robinhood had conducted internal analysis that

showed that Robinhood's execution quality was worse than that of other large retail broker-dealers in many respects.

57.43.  In October 2018, when certain Robinhood employees began gathering data to compare Robinhood's execution quality metrics to those of its competitors, other Robinhood personnel remarked that most of Robinhood's metrics were worse and discussed the execution quality metrics with certain senior Robinhood personnel.

58.44.  A more extensive analysis Robinhood conducted in March 2019 stated that "[n]o matter how we cut the data, our % orders receiving price improvement lags behind that of other retail brokerages by a wide margin." Robinhood further found that the amount of price improvement obtained for Robinhood customers was far lower than at competing broker-dealers, measured on a per order, per share, and per dollar traded basis. Senior Robinhood personnel were aware of this analysis.

59.45.  For most orders of more than 100 shares, the analysis concluded that Robinhood customers would be better off trading at another broker-dealer because the additional price improvement that such orders would receive at other broker-dealers would likely exceed the approximately $5 per-order commission costs that those broker-dealers were then charging. The analysis further determined that the larger the order, the more significant the price improvement losses for Robinhood customers—for orders over 500 shares, the average Robinhood customer order lost over $15 in price improvement compared to Robinhood's competitors, with that comparative loss rising to more than $23 per order for orders over 2,000 shares.

60.    Robinhood removed the claim about Robinhood's execution quality matching or beating that of other broker-dealers from its FAQ in June 2019, after staff from the Commission's Office of Compliance Inspections and Examinations raised concerns about that sentence.

61.46.   Between October 2016 and June 2019 at least, certain Robinhood orders lost a total of approximately $34.1 million in price improvement compared to the price improvement they would have received had they been placed at competing retail broker-dealers, even after netting the approximately $5 per-order commission costs those broker-dealers were charging at the time.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action on his own behalf and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of the Rule.

57.     The proposed Class is defined as:

**All former and current Customers of Robinhood in the  United States and its territoriesFlorida, United States who traded on Robinhood's platform within 4 years preceding the filing of this lawsuit (the "Class Period").**

58.     Excluded from the Class are the Defendants, their parents, subsidiaries, affiliates, officers and directors, any entity in which Robinhood has a controlling interest, all Customers who make a timely selection to be excluded, governmental entities, all judges assigned to hear any aspect of this litigation, as well as their immediate family members, and any of the foregoing's legal heirs and assigns.

59.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

60.      Plaintiff does not currently know the exact number of Class Members or their identities because such information is in the exclusive control of Robinhood and can only be ascertained by review of its records. However, Plaintiff believes that there are thousands of Class Members, and that the Class Members are sufficiently numerous and geographically dispersed so

that joinder of all Class Members is impracticable. Plaintiff further believes that Robinhood failed to disclose the source of its most substantial revenue source, customer order flows. Accordingly, it is believed that the amount in controversy easily exceeds $1,000,000,000.00.

61.     The claims of Plaintiff are typical of the Class, in that Plaintiff, like all Class Members, suffered the breach Robinhood's duty of "best execution" through the use of certain principle trading firms, resulting in a significant loss of money to each of the Class Members.

62.     The factual basis of Robinhood's misconduct is common to all Class Members and resulted in injury to all Class Members.

63.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class Members, including whether Robinhood:

> **a.      Violated its fiduciary duty by failing to provide the best execution available to its customers because of Robinhood's preferred use of specific principal trading firms to process Robinhood's customer order flows; and**
>
> **b.      The appropriate measure of damages sustained by Plaintiff and other Class Members by such violation.**

64.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense, and risk of inconsistent rulings that numerous individual actions would cause. Class treatment will also permit the adjudication of relatively small claims by Class Members who otherwise might not be able to afford to litigate their claims

individually. This class action presents no difficulties in management that would preclude maintenance as a class action.

65.     This forum is particularly desirable for the prosecution of this class action because ~~Robinhood maintains its regional headquarters in Lake Mary, Florida, and~~ the lead Plaintiff, along with the potential class is also domiciled in Florida. Similarly, Robinhood conducts business in Florida. As a result of the foregoing, litigating on a class action basis in this forum will likely decrease the cost of discovery and prosecution, generally.

66.     Plaintiff has suffered the harm alleged on behalf of the Class and has no interests antagonistic to the interests of any other Class Members. He is committed to the prosecution of this action and has retained counsel experienced in the prosecution of class actions, and in complex commercial actions in particular. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class Members. Plaintiff is not aware of any other pending litigation concerning this controversy that involves Class Members.

67.     Finally, the Class is readily definable and is one for which records likely exist in the files of Robinhood.

**COUNT I – BREACH OF FIDUCIARY DUTY AGAINST ROBINHOOD**

68.     The Plaintiff and the class members hereby re-aver~s~ and realleg~es~ the allegations in paragraphs 1-67 as if fully re-stated herein.

69.     Defendant Robinhood, as a broker-dealer, has fiduciary duties to its customers.

70.     One of those duties is the duty of best execution.

71.     The duty of best execution requires Defendant Robinhood to endeavor to execute customer orders on the most favorable terms reasonably available in the market under the circumstances.

72.     Instead of endeavoring to execute customer orders on the most favorable terms reasonably available in the market under the circumstances, Robinhood set up a system where only the market-makers who would agree to pay it high fees were allowed to route its orders.

73.     This list was not created with best execution metrics in mind, but rather it was created based on who would pay Defendant Robinhood the most.

74.     In creating such a list, Defendant Robinhood put its financial interests ahead of its customers' well-being.

75.     In doing, it breached its fiduciary duty to its customers.

76.     As a result of this arrangement, Defendant Robinhood's customers suffered damages.

77.     Additionally, as a result of this arrangement, Defendant Robinhood earned money that it would otherwise not have earned, had it not breached its fiduciary duty by setting up such a system.

**COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AS TO DEFENDANT CITADEL SECURITIES, LLC ("CITADEL")**

78.     The Plaintiff and the class members hereby re-aver and reallege the allegations in paragraphs 1-67 as if fully re-stated herein.

79.     Defendant Citadel Securities, LLC entered into agreements with Defendant Robinhood, whereby Defendant Citadel would pay Robinhood a high price for Robinhood's order flow.

80.     Robinhood negotiated a payment for order flow rate that was substantially higher than the rate the principal trading firms paid to other retail broker-dealers—which resulted in approximately a 20/80 split of the value between price improvement and payment for order flow. Robinhood explicitly offered to accept less price improvement for its customers than what the

**Formatted:** Indent: First line:  0.43"

principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself.

81.   In the industry, the amount of money that a market maker makes available for customer price improvements, and the broker's order flow, comes from the same pot.

82.   The typical split that brokers receive from market makers like Defendant Citadel, LLC is an 80/20 split.

83.   Meaning, 80% of the money paid by the market maker goes to customer price improvement, and 20% goes towards the broker's order flow.

78.84.   As a market maker, Defendant Citadel knew this at the time of Robinhood's proposal.

79.85.   As a result of this agreement, Defendant Citadel agreed to pay Robinhood less money in customer price improvement, and more money for order flow.

80.86.   This means that pursuant to the agreements between Defendant Citadel and Robinhood, Robinhood's customers would receive less money in price improvements, while Defendant Robinhood would receive more money for itself.

81.87.   Defendant Citadel, being part of the financial industry, knew that Defendant Robinhood owed a fiduciary duty of fair execution to its customers.

88.   Defendant Citadel knew that the arrangements between themselves and Defendant Robinhood violated said fiduciary duty by placing Defendant Robinhood's financial interests over that of its customers.

89.   Defendant Citadel knew that by agreeing to what Robinhood was proposing, it would play a critical role in enabling Robinhood to carry out the agreement.

82.90.   Said differently, if Defendant Citadel and other market makers refused to agree to the deal, because it ultimately was at odds with Robinhood's duty of best execution to its customers,

Robinhood would not be able to carry out the agreement.

83. 91. Despite knowing about said duty, and that such agreement violated said duty, Defendant Citadel consummated the arrangements.

92.     In doing so, Defendant Citadel aided and abetted Defendant Robinhood's breach of its fiduciary duty to its customers.

84.

85. 93. As a result, Defendant Robinhood's customers suffered damages.

86. 94. Defendant Citadel reaped a benefit from the arrangement, because pursuant to the arrangement Defendant Robinhood agreed to route order flow to Defendant Citadel.

87. 95. Defendant Citadel profited from receiving order flow because it allowed it to exit positions at a profit.

## COUNT III – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AS TO DEFENDANT APEX CLEARING CORPORATION ("APEX")

96.     The Plaintiff and the class hereby re-aver and reallege the allegations in paragraphs 1-67 as if fully restated herein.

97.     Defendant Apex Corporation entered into agreements with Defendant Robinhood, whereby Defendant Apex would pay Robinhood a high price for Robinhood's order flow.

98.     Robinhood negotiated a payment for order flow rate that was substantially higher than the rate the principal trading firms paid to other retail broker-dealers—which resulted in approximately a 20/80 split of the value between price improvement and payment for order flow. Robinhood explicitly offered to accept less price improvement for its customers than what the principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself.

99.     In the industry, the amount of money that a market maker makes available for customer price improvements, and the broker's order flow, comes from the same pot.

100.    The typical split that brokers receive from market makers like Defendant Apex is an 80/20 split.

88.101.     Meaning, 80% of the money paid by the market maker goes to customer price improvement, and 20% goes towards the broker's order flow.

89.102.     As a result of this agreement, Defendant Apex agreed to pay Robinhood less money in price improvement, and more money for order flow.

103.    This price was at times, as much as 33% higher than what competitors require that market makers pay for their order flow.

104.    In the industry, the amount of money that a market maker makes available for customer price improvements, and the broker's order flow, comes from the same pot.

105.    As a market maker, Defendant Apex knew this at the time of Robinhood's proposal.

106.    As a result of this agreement, Defendant Apex agreed to pay Robinhood less money in customer price improvement, and more money for order flow.

90.107.     This means that pursuant to the agreements between Defendant Apex and Robinhood, Robinhood's customers would receive less money in price improvements, while Defendant Robinhood would receive more money for itself.

108.    Defendant Apex, being part of the financial industry, knew that Defendant Robinhood owed a fiduciary duty of fair execution to its customers.

109.    Defendant Apex knew that by agreeing to what Robinhood was proposing, it would play a critical role in enabling Robinhood to carry out the agreement.

91.110.     Said differently, if Defendant Apex and other market makers refused to agree to the

deal, because it ultimately was at odds with Robinhood's duty of best execution to its customers, Robinhood would not be able to carry out the agreement.

> **Formatted:** Font: 12 pt

92.111.   Defendant Apex knew that the arrangements between themselves and Defendant Robinhood violated said fiduciary duty by placing Defendant Robinhood's financial interests over that of its customers.

93.112.   Despite knowing about said duty, and that such agreement violated said duty, Defendant Apex consummated the arrangements.

94.113.   In doing so, Defendant Apex aided and abetted Defendant Robinhood's breach of its fiduciary duty to its customers.

95.114.   As a result, Defendant Robinhood's customers suffered damages.

96.115.   Defendant Apex reaped a benefit from the arrangement, because pursuant to the arrangement Defendant Robinhood agreed to route order flow to Defendant Apex.

97.116.   Defendant Apex profited from receiving order flow because it allowed it to exit positions at a profit.

## COUNT IV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AS TO DEFENDANT SIGNA SECURITIES, LLC ("SIGMNA")

117.   The Plaintiff and the class hereby re-aver and reallege the allegations in paragraph 1-67 as if fully restated herein.

98.   Defendant Signma Securities, LLC entered into agreements with Defendant Robinhood, whereby Defendant Signma would pay Robinhood a high price for Robinhood's order flow.

118.

119.   Robinhood negotiated a payment for order flow rate that was substantially higher

> **Formatted:** Indent: First line: 0.37", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 68 + Alignment: Left + Aligned at: -0.43" + Indent at: 0.07"

than the rate the principal trading firms paid to other retail broker-dealers—which resulted in approximately a 20/80 split of the value between price improvement and payment for order flow. Robinhood explicitly offered to accept less price improvement for its customers than what the principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself.

120.    In the industry, the amount of money that a market maker makes available for customer price improvements, and the broker's order flow, comes from the same pot.

121.    The typical split that brokers receive from market makers like Defendant Signa is an 80/20 split.

122.    Meaning, 80% of the money paid by the market maker goes to customer price improvement, and 20% goes towards the broker's order flow.

123.    As a market maker, Defendant Signa knew this at the time of Robinhood's proposal.

124.    As a result of this agreement, Defendant Signa agreed to pay Robinhood less money in customer price improvement, and more money for order flow.

68.    As a result of this agreement, Defendant ~~Sigma~~ Signa agreed to pay Robinhood less money in price improvement, and more money for order flow.

125.

69.    This means that pursuant to the agreements between Defendant ~~Sigma~~ Signa and Robinhood, Robinhood's customers would receive less money in price improvements, while Defendant Robinhood would receive more money for itself.

126.

~~70.~~127. Defendant ~~Sigma~~Signa, being part of the financial industry, knew that Defendant Robinhood owed a fiduciary duty of fair execution to its customers.

128.    Defendant ~~Sigma~~ Signa knew that the arrangements between themselves and Defendant Robinhood violated said fiduciary duty by placing Defendant Robinhood's financial interests over that of its customers.

129.    Defendant Signa knew that by agreeing to what Robinhood was proposing, it would play a critical role in enabling Robinhood to carry out the agreement.

~~71.~~130. Said differently, if Defendant Signa and other market makers refused to agree to the deal, because it ultimately was at odds with Robinhood's duty of best execution to its customers, Robinhood would not be able to carry out the agreement.

~~72.~~131. Despite knowing about said duty, and that such agreement violated said duty, Defendant Sig~~nm~~a consummated the arrangements.

~~73.~~132. In doing so, Defendant Sig~~nm~~a aided and abetted Defendant Robinhood's breach of its fiduciary duty to its customers.

~~74.~~133. As a result, Defendant Robinhood's customers suffered damages.

~~75.~~134. Defendant Sigma reaped a benefit from the arrangement, because pursuant to the arrangement Defendant Robinhood agreed to route order flow to Defendant Sigma.

~~76.~~135. Defendant Sigma profited from receiving order flow because it allowed it to exit positions at a profit.

<u>COUNT V – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AS TO DEFENDANT WOLVERINE SECURITIES, LLC ("WOLVERINE")</u>

136.    The Plaintiff and the class hereby re-aver and reallege the allegations in paragraphs 1-67 as if fully restated herein.

137.    Defendant Wolverine Securities, LLC entered into agreements with Defendant Robinhood, whereby Defendant Wolverine would pay Robinhood a high price for Robinhood's

order flow.

138.   Robinhood negotiated a payment for order flow rate that was substantially higher than the rate the principal trading firms paid to other retail broker-dealers—which resulted in approximately a 20/80 split of the value between price improvement and payment for order flow. Robinhood explicitly offered to accept less price improvement for its customers than what the principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself.

139.   In the industry, the amount of money that a market maker makes available for customer price improvements, and the broker's order flow, comes from the same pot.

140.   The typical split that brokers receive from market makers like Defendant Wolverine is an 80/20 split.

77.141. Meaning, 80% of the money paid by the market maker goes to customer price improvement, and 20% goes towards the broker's order flow.

142.   As a result of this agreement, Defendant Wolverine agreed to pay Robinhood less money in price improvement, and more money for order flow.

143.   As a market maker, Defendant Wolverine knew this at the time of Robinhood's proposal.

78.144. As a result of this agreement, Defendant Wolverine agreed to pay Robinhood less money in customer price improvement, and more money for order flow.

79.145. This means that pursuant to the agreements between Defendant Wolverine and Robinhood, Robinhood's customers would receive less money in price improvements, while Defendant Robinhood would receive more money for itself.

146.   Defendant Wolverine, being part of the financial industry, knew that Defendant

Robinhood owed a fiduciary duty of fair execution to its customers.

147.    Defendant Wolverine knew that by agreeing to what Robinhood was proposing, it would play a critical role in enabling Robinhood to carry out the agreement.

80.148.  Said differently, if Defendant Wolverine and other market makers refused to agree to the deal, because it ultimately was at odds with Robinhood's duty of best execution to its customers, Robinhood would not be able to carry out the agreement.

81.149. Defendant Wolverine knew that the arrangements between themselves and Defendant Robinhood violated said fiduciary duty by placing Defendant Robinhood's financial interests over that of its customers.

82.150. Despite knowing about said duty, and that such agreement violated said duty, Defendant Wolverine consummated the arrangements.

83.151. In doing so, Defendant Wolverine aided and abetted Defendant Robinhood's breach of its fiduciary duty to its customers.

84.152. As a result, Defendant Robinhood's customers suffered damages.

85.153. Defendant Wolverine reaped a benefit from the arrangement, because pursuant to the arrangement Defendant Robinhood agreed to route order flow to Defendant Wolverine.

86.154. Defendant Wolverine profited from receiving order flow because it allowed it to exit positions at a profit.

**COUNT VI – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AS TO DEFENDANT VIRTU FINANCIAL, INC. ("VIRTU")**

155.    The Plaintiff and the class hereby re-aver and reallege the allegations in paragraphs 1-67 as if fully restated herein.

156.    Defendant Virtu Financial, Inc. entered into agreements with Defendant Robinhood,

whereby Defendant Virtu would pay Robinhood a high price for Robinhood's order flow.

157.    Robinhood negotiated a payment for order flow rate that was substantially higher than the rate the principal trading firms paid to other retail broker-dealers—which resulted in approximately a 20/80 split of the value between price improvement and payment for order flow. Robinhood explicitly offered to accept less price improvement for its customers than what the principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself.

158.    In the industry, the amount of money that a market maker makes available for customer price improvements, and the broker's order flow, comes from the same pot.

159.    The typical split that brokers receive from market makers like Defendant Virtu is an 80/20 split.

160.    Meaning, 80% of the money paid by the market maker goes to customer price improvement, and 20% goes towards the broker's order flow.

99.

161.    As a result of this agreement, Defendant Virtu agreed to pay Robinhood less money in price improvement, and more money for order flow.

162.    As a market maker, Defendant Virtu knew this at the time of Robinhood's proposal.

87.163.  As a result of this agreement, Defendant Virtu agreed to pay Robinhood less money in customer price improvement, and more money for order flow.

88.164.  This means that pursuant to the agreements between Defendant Virtu and Robinhood, Robinhood's customers would receive less money in price improvements, while Defendant Robinhood would receive more money for itself.

165.    Defendant Virtu, being part of the financial industry, knew that Defendant Robinhood

owed a fiduciary duty of fair execution to its customers.

166.     Defendant Virtu knew that by agreeing to what Robinhood was proposing, it would play a critical role in enabling Robinhood to carry out the agreement.

89.167. Said differently, if Defendant Virtu and other market makers refused to agree to the deal, because it ultimately was at odds with Robinhood's duty of best execution to its customers, Robinhood would not be able to carry out the agreement.

90.168. Defendant Virtu knew that the arrangements between themselves and Defendant Robinhood violated said fiduciary duty by placing Defendant Robinhood's financial interests over that of its customers.

91.169. Despite knowing about said duty, and that such agreement violated said duty, Defendant Virtu consummated the arrangements.

92.170. In doing so, Defendant Virtu aided and abetted Defendant Robinhood's breach of its fiduciary duty to its customers.

93.171. As a result, Defendant Robinhood's customers suffered damages.

94.172. Defendant Virtu reaped a benefit from the arrangement, because pursuant to the arrangement Defendant Robinhood agreed to route order flow to Defendant Virtu.

95.173. Defendant Virtu profited from receiving order flow because it allowed it to exit positions at a profit.

**JURY TRIAL DEMAND AND PRAYER FOR RELIEF AS TO ALL COUNTS**

WHEREFORE, for the reasons stated above, the Plaintiff and the class members respectfully demand a jury trial on all issues so triable, and requests that this Court grant the following relief:

1) A disgorgement of all profits obtained by the Defendants as a result of the breach of fiduciary duty committed by Defendant Robinhood.

2) Monetary damages to compensate Defendant Robinhood's customers for the losses they suffered as a result of Defendant Robinhood's failure to comply with its fiduciary duty of best execution.

3) Certifying the proposed Class and approving Plaintiff as class representative;

4) Appointing attorneys Igor Y. Hernandez, Michael A. Citron, and Ely R. Levy as Class Counsel;

5) Awarding Plaintiff and the Class damages in an amount to be proven at trial, along with costs, interest, and attorneys' fees; and

6) Awarding any further relief the Court deems just and proper.

Dated: November 26, 2021 ~~October 30, 2021~~

Respectfully and jointly submitted,

**MAC LEGAL, P.A., CORNISH HERNANDEZ GONZALEZ, PLLC, and LEVY & PARTNERS, PLLC, and jointly,** *as prospective Class counsel and counsel for Plaintiffs*

*/s/Michael A. Citron, Esq.*
Michael A. Citron, Esq.
Florida Bar No.: 105083
Kristen D. Montgomery, Esq.
Florida Bar No.: 1003495
**MAC LEGAL, P.A.**
4601 Sheridan Street, Ste. 205
Hollywood, Florida 33021
Telephone: (954) 395-2954
Michael@maclegalpa.com – Correspondence
KMontgomery@maclegalpa.com
Service@maclegalpa.com - Service Address

*/s/ Igor Hernandez*
Igor Hernandez, Esq.
Florida Bar No. 106386
**CORNISH HERNANDEZ GONZALEZ, PLLC**

Page | 31

2525 Ponce de Leon Blvd, Suite 300
Coral Gables, Florida 33134
Phone (305) - 780 - 6058
service@CHGLawyers.com
ihernandez@chglawyers.com

/s/Ely R. Levy, Esq.
Ely R. Levy, Esq.
Florida Bar No.: 15452
Venessa Valdes Solis, Esq.
Florida Bar No. 77122
**LEVY & PARTNERS, PLLC**
3230 Stirling Road, Suite 1
Hollywood, Florida 33021
Telephone: (954) 727-8570
elevy@lawlp.com – Service Address
venessa@lawlp.com – Service Address
Maritza@lawlp.com – Service Address