UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:21-cv-61848-COOKE/HUNT

JIM ANTONIO ALERS, on his own behalf, and on
behalf of those similarly situated,

      Plaintiff(s),

v.

ROBINHOOD FINANCIAL, LLC, CITADEL
SECURITIES, LLC, APEX CLEARING
CORPORATION, TWO SIGNA SECURITIES,
LLC, WOLVERINE SECURITIES, LLC,
and VIRTU FINANCIAL, INC.,

      Defendants.

_____/

DECLARATION OF BRANDON FETZER IN SUPPORT OF DEFENDANTS' JOINT
MOTION TO TRANSFER OR DISMISS

I, Brandon Fetzer, do hereby declare and state the following pursuant to 28 U.S.C. § 1746:

1.      I am an associate at Debevoise & Plimpton LLP and a member of the Bar of the State of New York.  I have been admitted *pro hac vice* to appear in connection with the above-captioned matter.  I make this declaration on personal knowledge and in support of Defendants' joint motion to transfer or dismiss.

2.      Attached as **Exhibit 1** is a true and accurate copy of the Order Granting Plaintiff Ji Kwon's Motion for Consolidation of Actions; Appointment of Lead Plaintiff; and Approval of Lead Counsel filed in *In re Robinhood Order Flow Litigation*, Master File No. 4:20-cv-09328-YGR (N.D. Cal. 2020).

3.      Attached as **Exhibit 2** is a true and accurate copy of the Consolidated Amended Class Action Complaint and Jury Demand filed in *In re Robinhood Order Flow Litigation*, Master File No. 4:20-cv-09328-YGR (N.D. Cal. 2020).

4.      Attached as **Exhibit 3** is a true and correct copy of the applicable Robinhood Financial LLC Customer Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 7th day of January 2022, at Long Island City, New York.


     */s/ Brandon Fetzer*

Brandon Fetzer

EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **JI KWON**, | Case No. 4:20-cv-09328-YGR |
| Plaintiff, | **ORDER GRANTING PLAINTIFF JI KWON'S MOTION FOR CONSOLIDATION OF ACTIONS; APPOINTMENT OF LEAD PLAINTIFF; AND APPROVAL OF LEAD COUNSEL** |
| v. | |
| **ROBINHOOD FINANCIAL LLC, ET. AL.,** | |
| Defendants. | Re: Dkt. No. 30 |
| **EDUARDO LUPARELLO,** | Case No. 4:21-cv-00415-YGR |
| Plaintiff, | |
| v. | |
| **ROBINHOOD FINANCIAL LLC, ET. AL.,** | |
| Defendants. | |
| **SARKHAN NABI**, | Case No. 4:21-cv-00755-YGR |
| Plaintiff, | |
| v. | |
| **ROBINHOOD FINANCIAL LLC, ET. AL.,** | |
| Defendants. | |
| **ROBEL GHEBREHIWET**, | Case No. 4:21-cv-01739-YGR |
| Plaintiff, | |
| v. | |
| **ROBINHOOD FINANCIAL LLC, ET. AL.,** | |
| Defendants. | |

United States District Court
Northern District of California

1   **ISAAC LANDRETH,**                                    Case No. 4:21-cv-02010-YGR

2                   Plaintiff,

3         v.

4   **ROBINHOOD FINANCIAL LLC, ET. AL.,**

5                   Defendants.

6

7           Before the Court is the unopposed[1] motion of plaintiff Ji Kwon requesting: (1)

8   consolidation of the related actions;[2] (2) appointment as Lead Plaintiff; and (3) approval of Lead

9   Counsel pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15

10  U.S.C. § 78u-4(a)(3)(B). (Dkt. No. 30.)  The Related Actions challenge the actions of defendants

11  Robinhood Financial LLC, Robinhood Securities, LLC, and Robinhood Markets, Inc. relating to

12  the failure to disclose the processes of payment for order flow.

13          Having considered the papers filed in support of the motion, and for good cause shown

14  therein, the Court **GRANTS** the motion and **HEREBY ENTERS** the following Order:[3]

15  **I.      CONSOLIDATION OF RELATED ACTIONS**

16          The above-captioned class actions pending in this federal judicial district are **HEREBY**

17  **CONSOLIDATED** for all purposes pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.

18  Any actions that have been filed, or may be filed, which are related and which may be considered

19

20          [1]  Defendants do not oppose the motion (Dkt. No. 42), and plaintiffs in the related actions
    discussed herein further do not oppose the motion.  (*See* Dkt. Nos. 41 (notice of withdraw of
21  competing motion to consolidate), 43 (non-opposition).)

22          [2]  The related actions include: (i) *Kwon v. Robinhood Financial LLC*, No. 4:20-cv-09328-
    YGR (N.D. Cal.); (ii) *Luparello v. Robinhood Financial LLC*, No. 4:21-cv-00415-YGR (N.D.
23  Cal.); (iii) *Nabi v. Robinhood Financial LLC*, No. 4:21-cv-0755-YGR (N.D. Cal.); and (iv)
    *Ghebrehiwet v. Robinhood Financial LLC*, No. 4:21-cv-01739 (N.D. Cal.).  The Court also
24  includes in this Order the later related case, *Landreth v. Robinhood Financial*, No. 4:21-cv-02010-
    YGR (N.D. Cal.).  All together, *Kwon*, *Luparello*, *Nabi*, *Ghebrehiwet*, and *Landreth* are defined as
25  the "Related Actions."

26          [3]  The Court has reviewed the papers submitted by the parties in connection with Kwon's
    motion, and has determined that the motion is appropriate for decision without oral argument, as
27  permitted by Civil Local Rule 7-1(b) and Federal Rule of Civil Procedure 78.  *See also Lake at
    Las Vegas Investors Group, Inc. v. Pacific Malibu Dev. Corp.*, 933 F.2d 724, 728-29 (9th Cir.
28  1991).  Accordingly, the hearing set for April 13, 2021 is **VACATED**.

2

herewith, are consolidated under Case No. 4:20-cv-09328-YGR (the "Consolidated Action").

A Master File is hereby established for the consolidated proceedings in the Consolidated Action.  The docket number for the Master File shall be Master File No. 4:20-cv-09328-YGR. The original of this Order shall be filed by the Clerk in the Master File.  Given the limitations imposed by the COVID-19 pandemic and limited court staff, notice to counsel of record shall be by posting of this Order in the Related Actions on ECF.  Lead Counsel shall ensure that all parties have been notified and shall file a Notice to the Court confirming the same.  All filings in the future shall be made solely within the Master File.   The Clerk of the Court is further directed to administratively close the following actions:

1. *Luparello v. Robinhood Financial LLC*, No. 4:21-cv-00415-YGR (N.D. Cal.);

2. *Nabi v. Robinhood Financial LLC*, No. 4:21-cv-0755-YGR (N.D. Cal.);

3. *Ghebrehiwet v. Robinhood Financial LLC*, No. 4:21-cv-01739 (N.D. Cal.); and

4. *Landreth v. Robinhood Financial*, No. 4:21-cv-02010-YGR (N.D. Cal.)

Every pleading filed in the Consolidated Action shall bear the following caption: *In re Robinhood Order Flow Litigation*, Master File No. 4:20-cv-09328-YGR.

## II.   APPOINTMENT OF LEAD COUNSEL AND LEAD PLAINTIFF

Kwon has moved this Court to be appointed as Lead Plaintiff in the Related Actions and to approve the counsel they retained to be Lead Counsel.

Having considered the provisions of Section 21D(a)(3)(B) of the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B), the Court hereby determines that Kwon is the most adequate lead plaintiff and satisfies the requirements of the PSLRA.  The Court **HEREBY APPOINTS** Kwon as Lead Plaintiff in the Related Actions to represent the interests of the class.

Pursuant to Section 21D(a)(3)(B)(v) of the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B)(v), Kwon has selected and retained the law firms Ahdoot & Wolfson, PC, Bursor & Fisher, PA, and Liddle & Dubin PC to serve as Lead Counsel.  The Court **APPROVES** Kwon's selection of Counsel for the Related Actions.  That said, the Court is concerned that the leadership structure is too top heavy and may result in extra fees and costs.  Within **five (5) business days**, Lead Counsel shall file with the Court an outline of the structure and anticipated lead on responsibilities and shall identify how

United States District Court
Northern District of California

3

1  Lead Counsel intend to ensure that this structure will not result in inefficiencies and duplicative

2  fees and costs.

3        Lead Counsel shall have the authority to speak for all plaintiffs and class members in all

4  matters regarding the litigation of the Related Actions, including, but not limited to, pretrial

5  proceedings, motion practice, trial and settlement. Lead Counsel shall make all work assignments

6  in such a manner as to facilitate the orderly and efficient prosecution of this litigation, and to avoid

7  duplicative or unproductive effort. Additionally, Lead Counsel shall have the following

8  responsibilities and duties, to be carried out either personally or through counsel whom Lead

9  Counsel shall designate:

10      1.    to coordinate the briefing and argument of any and all motions;

11      2.    to coordinate the conduct of any and all discovery proceedings;

12      3.    to coordinate the examination of any and all witnesses in depositions;

13      4.    to coordinate the selection of counsel to act as spokesperson at all pretrial

14  conferences;

15      5.    to call meetings of the plaintiffs' counsel as they deem necessary and appropriate

16  from time to time;

17      6.    to coordinate all settlement negotiations with counsel for defendants;

18      7.    to coordinate and direct the pretrial discovery proceedings and the preparation for

19  trial and the trial of this matter, and to delegate work responsibilities to selected counsel as may be

20  required;

21      8.    to coordinate the preparation and filings of all pleadings;

22      9.    to supervise all other matters concerning the prosecution or resolution of the claims

23      asserted in the Related Actions; and

24      10.    to perform such other duties as may be expressly authorized by further Order of

25  this Court.

26        No motion, discovery request, or other pretrial proceedings shall be initiated or filed by

27  any plaintiffs without the approval of Lead Counsel, so as to prevent duplicative pleadings or

28  discovery by plaintiffs. No settlement negotiations shall be conducted without the approval of the

United States District Court
Northern District of California

4

Lead Counsel.

Service upon any plaintiff of all pleadings, motions, or other papers in the Related Actions, except those specifically addressed to a plaintiff other than Lead Plaintiff, shall be completed upon service of Lead Counsel. Lead Counsel shall be the contact between plaintiffs' counsel and defendants' counsel, as well as the spokespersons for all plaintiffs' counsel, and shall direct and coordinate the activities of plaintiffs' counsel. Lead Counsel shall be the contact between the Court and plaintiffs and their counsel.

## III. NEWLY FILED OR TRANSFERRED ACTIONS

When a case that arises out of the subject matter of the Related Actions is hereinafter filed in this Court or transferred from another Court, Lead Counsel shall advise the Court and the parties in such so that the Clerk of this Court can:

1.  post a copy of this Order in the separate file for such action;

2.  by posting, advise the attorneys for the plaintiff(s) in the newly filed or transferred case and to any new defendant(s) in the newly filed or transferred case of this action; and

3.  make the appropriate entry on the docket for this action.

Each new case that arises out of the subject matter of the action that is filed in this Court or transferred to this Court shall be consolidated with the Related Actions and this Order shall apply thereto, unless a party objecting to this Order or any provision of this Order shall, within ten (10) days after the date upon which a copy of this Order is served on counsel for such party, file an application for relief from this Order or any provision herein and this Court deems it appropriate to grant such application.

During the pendency of this litigation, or until further order of this Court, the parties shall take reasonable steps to preserve all documents within their possession, custody or control, including computer-generated and stored information and materials such as computerized data and electronic mail, containing information that is relevant to or which may lead to the discovery of information relevant to the subject matter of the pending litigation.

## IV. CONCLUSION

For the foregoing reasons, the motion is **GRANTED**.

5

The Court **ORDERS** Kwon to file an amended consolidated complaint on or before **May 17, 2021**, which shall be the operative complaint in the Consolidated Action and shall supersede all previous complaints filed in any of the Related Actions or any other action subsequently therewith consolidated. Defendants therefore need not answer, move, or otherwise respond to the complaints currently filed in the other Related Actions (not including the Consolidated Action), which shall be administratively closed as ordered below.

Moreover, as previously discussed, Lead Counsel shall file with the Court within **five (5) business days** an outline of the structure and anticipated lead on responsibilities and shall identify how Lead Counsel intend to ensure that this structure will not result in inefficiencies and duplicative fees and costs. Lead Counsel shall ensure that all parties have been notified and shall file a Notice to the Court confirming the same as soon as reasonably practicable.

The Clerk of the Court is directed to consolidate the Related Actions, and name the Consolidated Action under the following caption: *In re Robinhood Order Flow Litigation*, Master File No. 4:20-cv-09328-YGR.

The Clerk of the Court is further directed to administratively close the following cases:

1. *Luparello v. Robinhood Financial LLC*, No. 4:21-cv-00415-YGR (N.D. Cal.);

2. *Nabi v. Robinhood Financial LLC*, No. 4:21-cv-0755-YGR (N.D. Cal.);

3. *Ghebrehiwet v. Robinhood Financial LLC*, No. 4:21-cv-01739 (N.D. Cal.); and

4. *Landreth v. Robinhood Financial*, No. 4:21-cv-02010-YGR (N.D. Cal.).

This Order terminates Docket Number 30.

**IT IS SO ORDERED.**

Dated: April 12, 2021

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT 2

Nicholas A. Coulson (admitted *pro hac vice*)
ncoulson@ldclassaction.com
Matthew Z. Robb (admitted *pro hac vice*)
mrobb@ldclassaction.com
**LIDDLE & DUBIN, P.C**.
975 E. Jefferson Ave.
Detroit, Michigan 48207
Tel: 313-392-0015; Fax: 313-392-0025

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Bradley King (SBN 274399)
bking@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111; Fax: (310) 474-8585

Scott A. Bursor (SBN 276006)
scott@bursor.com
Sarah Westcot (SBN 264916)
swestcot@bursor.com
**BURSOR & FISHER, P.A.**
701 Brickell Ave, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512; Fax: (305) 679-9006

*Plaintiff's Co-Lead Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Robinhood Order Flow Litigation | Master File No. 4:20-cv-09328-YGR |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |
| | Hon. Yvonne Gonzalez Rogers |

**INTRODUCTION**

1.       Plaintiff Ji Kwon ("Plaintiff"), by and through his counsel, files this Consolidated Amended Class Action Complaint against Robinhood Financial LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), and Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Defendants" or "Robinhood") on behalf of himself and on behalf of a class of similarly situated individuals, and alleges, upon personal knowledge as to his own actions, and upon investigation of counsel as to all other matters, as follows:

**NATURE OF THE ACTION**

2.       Robinhood, a multi-billion dollar mobile application and website investment service, has capitalized on a surge of first-time market investors by misleading and luring unsuspecting consumers to execute inferior market trades on the platform under the guise of "commission free" trading.

3.       Through a process of deceit and omission, Defendants misled consumers and failed to disclose that Robinhood's business operations relied extensively upon "payment for order flow," in which Defendants received payment from market makers in exchange for executing the service's trades.

4.       These payments often came at the expense of the consumer. While Defendants promoted and advertised an easy-to-use "commission free" trading platform, Defendants profited extensively from unsuspecting consumers who executed trades on Defendants' platform at inferior execution prices compared to what consumers would have received from Robinhood's competitors. For larger value orders, this price differential often exceeded the commission its competitors would have charged. These inferior prices were caused in large part by the unusually high charges Robinhood required from principal trading firms for the opportunity to obtain Robinhood's customer order flow.

5.       The principal trading firms/electronic market makers in turn passed these costs along to Robinhood's clients on each trade through inferior execution quality—the price at which the requested market orders were executed.

6.       Effectively, Robinhood charged backdoor commission fees to each of its clients' orders, while concealing and denying the payment for order flow scheme.

7.       To effectuate this scheme, Defendants published misleading statements and omissions in customer communications relating to the execution of trades and Robinhood's revenue sources. For

1

years, Robinhood's retail communications to consumers omitted receipt of payment for order flow, even though it was Robinhood's single largest source of revenue.

8.     Robinhood failed to disclose and omitted information regarding this process in numerous ways, including instructing customer service representatives not to mention payment for order flow in response to questions about Robinhood's sources of revenue and omitting it from its website's FAQ section.

9.     As a broker-dealer that routed customer orders for execution, Robinhood had a duty of best execution to its clients, a duty to seek and obtain the best reasonably available terms for customers' orders. Robinhood knowingly violated its duty of best execution by charging unusually high payment for order flow rates to its vendors and failing to conduct adequate regular and rigorous reviews of the execution quality it was providing on customer orders.

10.     Plaintiff brings this action on behalf of himself and a class of similarly situated individuals who were victims of Defendants' materially deceptive acts and omissions, relying upon Robinhood's warranties, advertisements, and representations, as well as Robinhood's duty of best execution in executing trades on consumer's behalf.

11.     Defendants have quietly sought to force its customers to execute trades on Defendants' platform at inferior prices compared to what consumers would have received from Robinhood's competitors, while profiting on the back end of those trades.

12.     Defendants uniform conduct is equally applicable to the class. Plaintiff brings this class action against Defendants for: (1) Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; (2) Violations of California Consumers Legal Remedies Act ("CLRA"), Civil Code § 1750, et seq.; (3) Violations of California Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, et seq.; (4) Violations of California False Advertising Law ("FAL"), Bus. & Prof. Code § 17500, et seq.; (5) Negligent Misrepresentation; (6) Breach of Implied Covenant of Good Faith and Fair Dealing; and (7) Breach of Fiduciary Duty.

13.     Plaintiff seeks an order for relief including but not limited to the following: (1) requiring Defendants to pay damages and restitution to Plaintiff and the Class; and (2) enjoining Defendants from further legal violations through Robinhood's payment for order flow collection scheme and requiring

2

Defendants to publicly correct the false and misleading statements and omissions alleged herein.

**JURISDICTION AND VENUE**

14.    This Court has original jurisdiction pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* This Court also has Class Action Fairness Act (CAFA) jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(a). CAFA jurisdiction is appropriate as this action's amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from Defendants.

15.    This Court has personal jurisdiction over Defendants because Defendants are citizens of California, conduct significant, substantial, and not-isolated business activities in California and a substantial portion of the acts complained of took place in California.

16.    Venue is proper in the Northern District of California because Defendants conduct business in this District and many of the events that gave rise to Plaintiff's claims occurred in this District.

**PARTIES**

17.    Plaintiff Ji Kwon is an individual and citizen of California for jurisdictional purposes.

18.    Defendant Robinhood Financial LLC is a Delaware LLC with its principal place of business located at 85 Willow Road, City of Menlo Park, County of San Mateo, State of California.

19.    Defendant Robinhood Securities, LLC is a Delaware LLC with its principal place of business located at 85 Willow Road, City of Menlo Park, County of San Mateo, State of California.

20.    Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business located at 85 Willow Road, City of Menlo Park, County of San Mateo, State of California.

**FACTUAL ALLEGATIONS**

**A.    Background**

21.    Robinhood offers self-directed securities brokerage services to customers by means of its website and smartphone applications. Robinhood is a Commission-registered broker-dealer and a member of Financial Industry Regulatory Authority ("FINRA"). Robinhood Financial acts as an introducing broker and has a clearing arrangement with Robinhood Securities. When customers open accounts with Robinhood, they enter into a customer agreement with Robinhood Financial and

1    Robinhood Securities.

2        22.    Robinhood was founded in 2013 and began offering retail brokerage accounts to the

3    general public in March 2015. Robinhood distinguished itself from other retail-oriented broker-dealers

4    by, among other things, allowing customers to place orders to buy and sell securities without paying a

5    trading commission. It was this price-value proposition that allowed Robinhood to rapidly grow.

6        23.    By June 2019, Robinhood had 9 million approved customer accounts.

7        **B.**    **Principal Trading Firms and Payment for Order Flow**

8        24.    Rather than sending customer orders to buy or sell equity securities directly to national

9    exchanges, Robinhood, like other retail broker-dealers, routed its orders to other broker-dealers (often

10    referred to as "principal trading firms" or "electronic market makers") to either execute those orders or

11    route them to other market centers.

12        25.    Principal trading firms attempt to profit from executing large volumes of retail buy and

13    sell orders either by taking the other side of customer orders and exiting the positions at a profit, which

14    is also known as "internalization," or by routing the orders to other market centers.

15        26.    Historically, market makers paid fees to regional intermediaries for their services in

16    executing trades with other local firms on behalf of the market maker. In order to grow a guaranteed

17    supply of liquidity in their markets, market makers began offering payments to not only the

18    intermediaries, but also retail firms, including brokers, in exchange for the retail firms routing their

19    orders to the market makers. This practice, which expanded from off-exchange securities (over-the-

20    counter or "OTC" securities) to exchange-traded securities, came to be known as "payment for order

21    flow." Over time, different types of venues, including Electronic Communication Networks ("ECNs")

22    and exchanges, also began making payments for order flow.

23        27.    Principal trading firms offer incentives to retail broker-dealers to send them order flow.

24    One such incentive is "payment for order flow," which is defined in Rule 10b-10(d)(8) of the Exchange

25    Act to include any monetary payment, service, property, or other benefit that results in remuneration,

26    compensation, or consideration to a broker-dealer in return for the routing of customer orders.

27        28.    Since it began operating as a broker-dealer, Robinhood, like other retail broker-dealers,

28    has received payment for order flow in exchange for routing its customer orders to principal trading

1    firms.

2      29.  SEC rules permit the receipt of payment for order flow by broker-dealers as long as it

3    does not interfere with their efforts to obtain best execution, and as long as the routing of that order flow,

4    as well as a description of all terms of any such arrangements that may influence the broker-dealer's

5    order routing decision, are disclosed in quarterly reports filed pursuant to 17 CFR § 242.606 (Disclosure

6    of order routing information, "SEC Rule 606").

7      30.  Another incentive that principal trading firms may provide to retail broker-dealers is

8    "price improvement" on customer executions. Price improvement occurs when a customer order

9    receives an execution at a price that is superior to the best available quotation then appearing on the

10   public quotation feed, that is, by executing a "buy" order at a price lower than the lowest prevailing

11   offer or executing a "sell" order at a price higher than the highest prevailing bid.

12     31.  Price improvement creates a direct financial benefit for the customer, since the customer

13   receives a better price than he or she would have received had the order been executed at the national

14   best bid and offer ("NBBO") on the public quotation feed.

15     32.  In practice, most retail broker-dealers obtain price improvement on the vast majority of

16   customer orders that they send to principal trading firms.

17     **C.**  **The Duty of Best Execution**

18     33.  Broker-dealers such as Robinhood owe their customers a duty of "best execution." Best

19   execution requires that a broker-dealer endeavor to execute customer orders on the most favorable terms

20   reasonably available in the market under the circumstances. This includes taking into account price,

21   order size, trading characteristics of the security, as well as the potential for price improvement and other

22   factors. *See Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 135 F.3d 266, 270 & n.2 (3d Cir. 1998);

23   *Marc N. Geman*, Securities Exchange Act Release No. 43963 (Feb. 14, 2001) (Commission opinion).

24     34.  Although a broker-dealer is not required to examine every customer order individually

25   for compliance with its duty of best execution, it must undertake regular and rigorous reviews of the

26   quality of its customer order executions. *See Payment for Order Flow*, Securities and Exchange

27   Commission Final Rule Release, Exchange Act Release No. 34902, 59 Fed. Reg. 55006, at 55009 (Oct.

28   27, 1994) (*"Payment for Order Flow Release"*).

35.     The duty of best execution derives from, among other sources, the common law agency duty of loyalty, which obligates an agent to act exclusively in the principal's best interest. Payment for order flow has the potential to create a conflict of interest between the broker-dealer and its customer because payment for order flow is a benefit that goes to the broker-dealer itself, whereas other incentives that may be obtained for routing order flow, such as price improvement, benefit the broker-dealer's customers. A broker-dealer must not allow payment for order flow to interfere with its efforts to obtain best execution. *See Payment for Order Flow Release*, at 55009 & n.28.

36.     In the context of transacting in securities, best execution requires that, when conducting a transaction on behalf of a client, a broker seek the terms most favorable to the client that can possibly be obtained given the present circumstances.

37.     When securities are traded in different venues, best execution requires that, absent instruction otherwise from the client, a broker-dealer ensure that the client's order be routed to the best possible venue. A broker achieves best execution when it endeavors to obtain the best price available, execute the transaction in the shortest possible time frame, maximize the likelihood that the transaction is executed in its entirety, and, where possible, seek "price improvement"—the execution of a trade at a price better than the best current public quote.

38.     NASD Rule 2320 provided that Robinhood, as a broker-dealer, would "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."

39.     The factors to be considered in determining reasonable diligence were "(A) the character of the market for the security, e.g., price, volatility, relative liquidity, and pressure on available communications; (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to" Robinhood.

40.     Financial Industry Regulatory Authority ("FINRA") Rule 5310, which superseded NASD Rule 2320 on May 31, 2012, incorporates all of that Rule's provisions concerning a broker-dealer's duty of best execution.

**D.** **Robinhood's Initial Public Messaging Concerning Payment for Order Flow**

41.     In 2014, prior to its public launch, Robinhood published an FAQ page on its website providing information about the company and its anticipated brokerage operations. The first version of the FAQ disclosed that Robinhood anticipated receiving payment for order flow in its answer to the question "How does Robinhood make money?"

42.     Also in 2014, a best-selling author published a book that chronicled various aspects of the electronic securities trading industry and portrayed payment for order flow as a controversial practice.[1]

43.     Several news organizations also published articles discussing payment for order flow and other issues concerning electronic trading venues.[2]

44.     Senior Robinhood personnel were aware of these publications and the ensuing controversy regarding payment for order flow and its association with principal trading firms (which were also sometimes referred to as "high frequency trading firms"). They became concerned that if the public associated Robinhood with payment for order flow and high frequency trading firms, it could be viewed as controversial by Robinhood's customers.

45.     In light of these concerns, in December 2014, Robinhood removed the reference to payment for order flow from its answer to the "How does Robinhood make money" FAQ and created a new FAQ page that specifically discussed payment for order flow.

46.     This new FAQ page stated that the payment for order flow revenue Robinhood received at the time was "indirect" and "negligible." It also stated that if payment for order flow ever became a direct or significant source of revenue, Robinhood would inform customers of those facts on the "How does Robinhood make money" FAQ page.

47.     In the first quarter of 2015, Robinhood launched its trading platform to the public. Although the company's overall revenue was modest in 2015 through mid-2016, during that time

---

[1] https://www.pbs.org/newshour/show/flash-boys-investigates-high-frequency-traders-anticipate-wall-streets-next-move-faster (last visited December 21, 2020).

[2] https://www.ft.com/content/97810c5e-fd1c-11e3-8ca9-00144feab7de (last visited December 21, 2020).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND; CASE NO. 4:20-CV-9328-YGR

1   payment for order flow comprised more than 80% of the company's revenue.

2       48.    These payments received for order flow were directly related to client orders and

3   constituted a significant amount of the company's revenue. Yet, Robinhood concealed these facts from

4   its clients.

5       **E.    Robinhood Received Unusually High Payment for Order Flow Rates and Failed to
        Conduct Rigorous Reviews of its Execution Quality**

6

7       49.    Initially, Robinhood relied on another broker-dealer to provide both clearing and order

8   execution services for Robinhood customer orders. That broker-dealer routed Robinhood customer

9   orders to principal trading firms, received payment for order flow in return, and shared a portion of that

10  payment for order flow with Robinhood.

11      50.    During the first half of 2016, Robinhood decided to start routing customer orders directly

12  to principal trading firms and cease relying on the other broker-dealer for order execution routing

13  services. By doing so, Robinhood could earn additional payment for order flow revenue.

14      51.    In or around May 2016, Robinhood began negotiations with a number of principal trading

15  firms about potentially routing Robinhood customer orders to those entities.

16      52.    During those negotiations, certain principal trading firms told Robinhood that there was

17  a trade-off between payment for order flow on the one hand and price improvement on the other: If

18  Robinhood negotiated for higher payment for order flow revenue, according to the principal trading

19  firms, there would be less money available for the principal trading firms to provide price improvement

20  to Robinhood's customers.

21      53.    At least one principal trading firm communicated to Robinhood that large retail broker-

22  dealers that receive payment for order flow typically receive four times as much price improvement for

23  customers as they do payment for order flow for themselves—an 80/20 split of the value between price

24  improvement and payment for order flow.

25      54.    Robinhood negotiated a payment for order flow rate that was substantially and unusually

26  higher than the rate the principal trading firms paid to other retail broker-dealers—which resulted in

27  approximately a 20/80 split of the value between price improvement and payment for order flow.

28      55.    Robinhood explicitly agreed to accept less price improvement for its customers than what

the principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself. However, Robinhood did not disclose this fact to its clients.

56.     In September 2016, Robinhood began routing customer orders directly and solely to principal trading firms. Around the same time, Robinhood formed a "Best Execution Committee" to monitor the speed and the prices at which the principal trading firms were executing Robinhood customer orders. The Committee met at least once per month and included Robinhood's General Counsel. From October 2016 through at least June 2019, the Committee observed that Robinhood was not obtaining much price improvement on its customer orders in equity securities, particularly on orders of 100 shares or more.

57.     Meanwhile, in 2017, Robinhood developed a proprietary routing algorithm, known as a smart order router, designed to make the principal trading firms with which Robinhood had payment for order flow arrangements compete for order flow by routing customer orders to the principal trading firm that had provided the most price improvement for that stock over the prior 30 days. However, the smart order router did not address Robinhood's high payment for order flow rates or any potential execution prices that may be available at venues that did not agree to pay those rates. Even with its "smart" order router, Robinhood customer orders received poor execution quality.

58.     Although Robinhood was on notice that its high payment for order flow rates could lead to less price improvement, the Best Execution Committee did not conduct adequate, regular, and rigorous reviews to ensure that Robinhood was satisfying its best execution obligations.

59.     The Committee took no steps to determine whether Robinhood's payment for order flow rates were having a negative impact on the execution prices that Robinhood's customers received. Until October 2018, the Committee did not consider how Robinhood's price improvement statistics compared to those of other retail broker-dealers, or to the retail order execution market generally.

60.     In mid-2017, when one of the principal trading firms to which Robinhood routed order flow told Robinhood it would no longer agree to pay Robinhood's unusually high payment for order flow rates, but would pay a lower payment for order flow rate, Robinhood stopped routing customer orders to that principal trading firm.

61.     When certain Robinhood personnel began comparing the firm's order execution quality

to competitors in October 2018, they learned that for most execution quality metrics, including the percentage of orders receiving price improvement, Robinhood's execution quality was worse.

62. By March 2019, Robinhood had conducted a more extensive internal analysis, which showed that its execution quality and price improvement metrics were substantially worse than other retail broker-dealers in many respects, including the percentage of orders that received price improvement and the amount of price improvement, measured on a per order, per share, and per dollar traded basis. Senior Robinhood personnel were aware of this analysis.

63. However, Robinhood's Best Execution Committee did not take appropriate steps to assess whether, in light of this information, Robinhood was complying with its duty to seek best execution of customer orders. Robinhood's failure from October 2016 through at least June 2019 to conduct adequate regular and rigorous reviews that involved benchmarking its execution quality against competitor broker-dealers to determine whether it was obtaining the best terms reasonably available for customer orders, violated the firm's duty of best execution.

**F.  Robinhood Misleadingly Omitted Payment for Order Flow From Descriptions of Its Revenue Sources**

64. By the end of 2016, Robinhood was generating a significant amount of revenue, the majority of which its controlling officers knew continued to come from payment for order flow. However, contrary to what the company had said in the payment for order flow FAQ, Robinhood did *not* disclose the new payment for order flow arrangements in its answer to the "How Robinhood Makes Money" FAQ on its website. Instead, at some point during 2016, Robinhood deleted the payment for order flow FAQ altogether.

65. Robinhood kept no records showing when the payment for order flow FAQ was deleted, why it was deleted, or who was responsible for approving its removal.

66. Between late 2016 and September 2018, Robinhood continued to grow rapidly. Although payment for order flow remained the company's largest revenue source throughout this period, Robinhood did not include payment for order flow as a revenue source in its answer to the "How Robinhood Makes Money" FAQ on its website.

67. The company failed to update the FAQ to include payment for order flow despite the fact

10

that, in 2016 and 2017, the company did update the FAQ to include two other, smaller revenue sources: subscription-based memberships and interest on securities lending. The version of the "How Robinhood Makes Money" FAQ page that was posted on Robinhood's website from approximately April 2017 through September 2018 stated:



68. Robinhood kept incomplete records of its updates to the "How Robinhood Makes Money" FAQ page, including incomplete records of who was responsible for approving updates to that page.

69. The "How Robinhood Makes Money" FAQ was featured in certain of Robinhood's customer communications. From at least February 22, 2016 to October 26, 2017 Robinhood displayed a link to the "How Robinhood Makes Money" FAQ on the home page of its website:



11

70.     Moreover, Robinhood instructed customer service representatives to direct customers to the "How Robinhood Makes Money" FAQ page or use the language of the misleading FAQ answer when responding to general questions about how Robinhood made money. Thus, in response to inquiries from its customers between 2015 and August 2018 about how Robinhood made money—approximately 150 inquiries in total—Robinhood's customer service representatives did not identify payment for order flow as one of the company's revenue sources.

71.     Training documents for customer service representatives in early 2018 explicitly instructed them to "avoid" talking about payment for order flow and stated that it was "incorrect" to identify payment for order flow in response to the question how Robinhood makes money.

72.     Throughout this period, Robinhood disclosed some information about its receipt of payment for order flow as required in SEC-mandated reports pursuant to Rule 606. The company included these reports on the "Disclosure Library" page on its website that included a number of other legally-mandated disclosures. However, the company did not feature the "Disclosure Library" or the reports contained in that library prominently in its communication strategy, like it did with the "How Robinhood Makes Money" FAQ page.

73.     Robinhood's customer agreements and trade confirmations stated only vaguely that Robinhood "may" receive payment for order flow.

### G.     Robinhood Falsely Claimed That Its Execution Quality Matches or Beats That of Its Competitors

74.     In response to media reports in September and October 2018 about Robinhood's payment for order flow rates, Robinhood added payment for order flow to the list of revenue sources appearing on the "How Robinhood Makes Money" FAQ page.

75.     But on October 12, 2018, it also published a new FAQ page that discussed payment for order flow and Robinhood's order execution quality. The new FAQ page stated that Robinhood's "execution quality and speed matches or beats what's found at other major brokerages." It also cited one statistic related to execution speed and one statistic related to the percentage of orders for S&P 500 stocks executed within the NBBO.

**What is the execution quality for orders on Robinhood?**

Reg NMS ensures your order gets executed at the national best bid and offer, or better, at the time of execution. Our execution quality and speed matches or beats what's found at other major brokerages. Even when measured at the time of routing, our customers' orders get executed at the NBBO or better. By way of example, in August 2018, 99.12% of our customers' marketable orders were executed at the the national best bid and offer or better with an execution speed of 0.08 seconds from routing to execution (for S&P 500 stocks, during market hours).

76. However, the internal analyses referenced in the paragraphs above that Robinhood conducted in October 2018 and March 2019 showed that Robinhood's execution quality was worse than that of other large retail broker-dealers in many respects. In particular, in October 2018, when certain Robinhood employees began gathering data to compare Robinhood's execution quality metrics to those of its competitors, other Robinhood personnel remarked that most of Robinhood's metrics were worse and discussed the execution quality metrics with certain senior Robinhood personnel.

77. A more extensive analysis Robinhood conducted in March 2019 stated that "[n]o matter how we cut the data, our % orders receiving price improvement lags behind that of other retail brokerages by a wide margin."

78. Robinhood further found that the amount of price improvement obtained for Robinhood customers was far lower than at competing broker-dealers, measured on a per order, per share, and per dollar traded basis. Senior Robinhood personnel were aware of this analysis.

79. For most orders of more than 100 shares, the analysis concluded that Robinhood customers would be better off trading at another broker-dealer because the additional price improvement that such orders would receive at other broker-dealers would likely exceed the approximately $5 per-order commission costs that those broker-dealers were then charging.

80. The analysis further determined that the larger the order, the more significant the price improvement losses for Robinhood customers—for orders over 500 shares, the average Robinhood customer order lost over $15 in price improvement compared to Robinhood's competitors, with that comparative loss rising to more than $23 per order for orders over 2,000 shares.

81. Robinhood removed the claim about Robinhood's execution quality matching or beating that of other broker-dealers from its FAQ in June 2019, after staff from the Commission's Office of Compliance Inspections and Examinations raised concerns about that sentence.

82. Between October 2016 and June 2019, certain Robinhood orders lost a total of approximately $34.1 million in price improvement compared to the price improvement they would have received had they been placed at competing retail broker-dealers, even after netting the approximately $5 per-order commission costs those broker-dealers were charging at the time.

**H.** **Plaintiff's Use of Defendants' Services**

83. Plaintiff Ji Kwon was a user of Defendants' services from 2017 throughout the end of the Class Period midway through 2019.

84. During the Class Period, Plaintiff made several thousands transactions through Defendants' platform, involving more than 257,000 shares and several million dollars.

85. Plaintiff believed that his market orders would be executed by Defendants at the best available price, and he was unaware that Robinhood was receiving compensation directly related to his orders as payment for order flow.

86. Plaintiff did not know that Robinhood's receipt of payment for order flow was causing him to receive such unfavorable market prices on his orders.

87. Plaintiff purchased shares of U.S. based exchange-listed stocks in trades executed at purported market prices during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct and inferior execution quality.

88. Robinhood, in its capacity as a broker, received payment for order flow from market-makers to which the company routed its client's orders.

89. At all times relevant to this complaint, Robinhood was bound by a duty of best execution.

90. Defendants have failed to provide best execution for their clients, causing them material harm in the form of economic loss due to their orders going unfilled, underfilled, filled at a suboptimal price, and/or filled in a manner which adversely affects the order's performance post-execution.

91. By receiving higher payments for order flow than its competitors, Robinhood negatively impacted, among other things, its clients' order execution and chances for price improvement.

92. Robinhood did not pass along the payment for order flow it received on market orders to the clients who placed the orders. Instead, the Company pocketed these payments for order flow for itself and failed to disclose to Plaintiff and the putative class that it received substantial payment for order

1  flow, or that these payments had a direct, adverse impact on the prices its clients received on their orders.

2        93.     Defendants' promise to provide "commission free" trading at best execution of its clients'

3  orders caused Plaintiff and the Class to do business with Defendants, even though they could have placed

4  orders through broker-dealers offering similar digitized trading platforms.

5        94.     Plaintiff acted reasonably in relying on Defendants' promises to offer commission free

6  trading at best execution compared to the offerings of Defendants' competitors.

7        95.     Defendants intended for Plaintiff and the Class to rely on those promises in order to

8  induce potential clients to open accounts and begin making market trades on Robinhood's platform,

9  instead of their competitors' platforms.

10        96.     Defendants, Defendants' agents, and Defendants' senior management knew that the

11  "commission free" trading promise was misleading under the circumstances and that the company's

12  substantial, required payment for order flow conditions placed on its principal trading firm vendors

13  could, would, and did cause Defendants' clients to uniformly receive inferior execution quality on market

14  orders.

15        97.     Plaintiff and the Class suffered economic damages because of Defendants' unfair,

16  unlawful, deceptive and misleading material acts and omissions, and Defendants' scheme to charge

17  backdoor commission fees without disclosing the impact of those fees on Plaintiff and the Class.

18  **CLASS ALLEGATIONS**

19        98.     Plaintiff brings this class action under Rule 23 and seek certification of the claims and

20  issues in this action pursuant to the applicable provisions of Rule 23.  The proposed class is defined as:

21

22           **All persons in the United States or its Territories who were users of**

23           **Robinhood between September 1, 2016 and June 16, 2020 and who placed**
         **orders in connection with which Defendants received payment for order**
         **flow (the "Class").**

24

25  Excluded from the Class are Defendants' officers, directors, and/or employees

26        99.     Plaintiff reserves the right to amend or modify the Class definitions with greater

27  specificity or division into subclasses after having had an opportunity to conduct discovery.

28        100.    Numerosity. Fed. R. Civ. P. 23(a)(1).  The members of the Class are so numerous that

15

their individual joinder is impracticable. Defendants had some nine million user accounts in June of 2019. Plaintiff is informed and believes there are, at minimum, hundreds of thousands of Class Members who have been damaged by the Robinhood's conduct as alleged herein. The exact size of the proposed class and the identity of all class members can be readily ascertained from Defendants' records.

101.   Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members.  Common issues include:

A.   Whether the statements made by Defendants as part of their promises to provide, and assertions that they do provide, best execution of their clients' orders, discussed herein are true, or are reasonably likely to deceive, given the omissions of material fact described above;

B.   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

C.   Whether statements made by the Defendants' officers, directors, and employees to the investing public during the Class Period misrepresented material facts about the business, operations and management of Defendants;

D.   Whether Defendants' conduct constitutes a breach of fiduciary duties and/or the duty of best execution;

E.   The nature of the relief, including equitable relief, to which Plaintiff and the class are entitled.

102.   Typicality.  Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the Class he seeks to represent.  Plaintiff and all Class members were subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff and members of the Class. By placing orders in connection with which Defendants received payment for order flow during the relevant time period, all members of the Class were subjected to the same wrongful conduct. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

103.    Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Further, Plaintiff's counsel is competent and experienced in litigating class actions, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no adverse or antagonistic interests to those of the Class.

104.    Superiority. Fed. R. Civ. P. 23(b)(3).  A class action is superior to any other available means for the fair and efficient adjudication of this controversy.  The claims of Plaintiff and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendants, and it would be impracticable for class members to seek redress individually.  Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments.  Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendants' misconduct.  Class certification is therefore appropriate under Rule 23(b)(3).

105.    Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

106.    Class certification is also appropriate under Rule 23(b)(2), as Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

## **FIRST CAUSE OF ACTION**

### **Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5**

107.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

108.    This Count is based upon Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated thereunder by the SEC.

109.    Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Robinhood's routing of customer orders and any effect that Robinhood's routing procedures have, or are likely to have, on the execution quality of its clients' orders.

110.    Defendants further have a duty of best execution, by which Defendants, as a dealer-

broker, are legally required to seek the best price reasonably available for their customers' orders.

111. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud, deceit, and/or manipulation upon Plaintiff and the Class, uniformly denying its customers best execution.

112. Defendants made numerous untrue statements of facts and omitted material facts necessary to make the statements made not misleading in light of the circumstances under which they were made.

113. Defendants further employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities, including by routing orders only to third party trading firms that agreed to render Robinhood's demanded payment for order flow, despite this knowingly causing Defendants' clients to receive inferior execution rates.

114. This scheme by Defendants, including the materially misleading statements and omissions thereunder, was intended to, and throughout the Class Period did: (i) deceive Defendants' clients, including Plaintiff and other Class Members; (ii) cause the Class members to engage in a broker-client relationship with Defendants, which they otherwise would not have done; (iii) cause Plaintiff and the Class to make orders which they otherwise would not have placed; and (iv) deprive Plaintiff and the Class of the best execution of their orders.

115. Further, Defendants knew that by failing to provide its clients with the best execution of their orders, each Plaintiff and Class Member would, and did, incur economic harm arising from executing Plaintiff's trades at prices less favorable than the best price available, including the chance to obtain a better price than the NBBO.

116. Pursuant to the above plan, scheme, and course of conduct, Defendants and their agents, including senior management, participated directly or indirectly in the preparation of public statements and reports, including statements made to Defendants' clients, governmental entities, security analysts, and the media, that were designed to convince the public and general, and Plaintiff and the Class in particular, that Defendants were providing commission-free trading at best execution price to their clients, when Robinhood and their agents knew that it was not.

117.     Such statements and omissions were materially false and misleading with regard to Defendants' order routing practices and the means by which the company was profiting from its clients through undisclosed, but systematic, payments for order flow.

118.     Defendants, Defendants' agents, and Defendants' senior management had actual knowledge of the materially false and misleading statements and material omissions alleged herein. Or, in the alternative, Defendants, Defendants' agents, and Defendants' senior management acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available.

119.     Defendants and Defendants' senior management had actual knowledge of, or recklessly disregarded, the plan and scheme by which the Robinhood routed orders for the purpose of extracting payment for order flow, despite this practice uniformly failing to satisfy Defendants' duty of best execution.

120.     Defendants are liable both directly and indirectly for the wrongs alleged herein. Defendants and Defendants' senior managers were able to, and did, directly or indirectly control the content of the misleading public statements and omissions made by Robinhood.

121.     As a result of Defendants' plan, scheme, conspiracy, and course of conduct, and the materially misleading statements and omissions made in furtherance thereof, Plaintiff and the Class placed orders through Robinhood with the reasonable expectation of receiving best execution throughout the Class Period.

122.     Without knowledge that Defendants were knowingly failing to satisfy their duty of best execution, which was concealed and misrepresented by Defendants through numerous platforms, Plaintiff and the Class placed orders through Robinhood, in reasonable reliance on the materially false and misleading statements and omissions, causing economic injury and damages.

123.     Defendants' plan, scheme, conspiracy, and course of conduct had a uniform effect on Plaintiff and the Class, in that the diversion of order flow to principal trading firms who agreed to satisfy Defendants' substantial demand for payment for order flow caused uniformly inferior execution quality compared to the prices available on the market through other firms.

124.    Defendants' plan, scheme, conspiracy, and course of conduct constituted a fraud on the market, in that the price at which each stock is traded was presumably impacted by Defendants' fraudulent information, thus injuring every investor who trades in any particular security.

125.    Through the conduct alleged herein, Defendants have, knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Security Exchange Act and Rule 10b-5 promulgated thereunder.

126.    At the time Plaintiff and the Class made orders with Defendants for securities, better prices were available to Plaintiff and the Class on each order, but these prices were not provided by Defendants.

127.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff and the Class have suffered economic damages in connection with Defendants' routing of their orders and failure to satisfy its duty of best execution during the Class Period.

## SECOND CAUSE OF ACTION

### Violations of CLRA – Civil Code § 1750, et seq.

128.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

129.    This cause of action is brought pursuant to the CLRA, California Civil Code § 1750, et seq., because Defendants' actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

130.    Plaintiff and each member of the Class are consumers as defined by California Civil Code §1761(d).

131.    The securities at issue herein are Goods within the meaning of Civil Code §1761(a) and Defendants' services are Services within the meaning of Civil Code §1761(b).

132.    In violation of Civil Code § 1770(a)(5), Defendants, by use of the untrue or misleading statements and/or omissions set forth and alleged in this complaint, represented that goods and/or services have characteristics or benefits which they do not have.

133.    In violation of Civil Code § 1770(a)(7), Defendants, by use of the untrue or misleading statements and/or omissions set forth and alleged in this complaint, represented that the goods are of a particular standard, quality, or grade, when they were in fact below that standard, quality, and/or grade.

134. In violation of Cal. Civ. Code § 1770(a)(9), Defendants advertised their goods and/or services with the intent not to sell them as advertised (because it knew that their securities were sold at inferior execution quality than advertised).

135. In violation of Cal. Civ. Code § 1770(a)(13), Defendants made materially false or misleading statements of fact and/or omissions concerning the reasons for, existence of, or amounts of price reductions.

136. In violation of Cal. Civ. Code § 1770(a)(14), Defendants represented that the security transactions involved rights, remedies, and/or obligations which it does not have or involve, or that are prohibited by law, as Defendants explicitly and/or implicitly represented that their securities were bought and sold on behalf of clients at best execution, while Defendants knew they were not.

137. In violation of Cal. Civ. Code § 1770(a)(16), Defendants represented that the subject of a transaction had been supplied in accordance with a previous representation (that securities would be bought and sold at best execution) when Defendants knew they were not.

138. Defendants knew, or should have known, that their representations and advertisements about the routing of their orders and the execution qualities of the security transactions made on behalf of clients were false or misleading.

139. Plaintiff notified Defendants in writing, by certified mail, of the violations alleged herein and demanded that Defendants remedy those violations. Attached hereto is a declaration on behalf of Plaintiff pursuant to Cal. Civ. Code § 1780(d).

140. As a result of Defendants' unlawful conduct, Plaintiff and the Class suffered economic damages as stated herein, including through the loss of value in the securities ordered through Defendants' companies.

141. As Defendants have failed to remedy the violations alleged herein within 30 days of receipt of Plaintiff's notice, Plaintiff seeks actual, punitive, and statutory damages, as well as injunctive relief, pursuant to the CLRA.

142. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally and knowingly provided misleading information to the public and refused to remedy the problem long after definitively learning that their product offerings were substandard.

**THIRD CAUSE OF ACTION**

**Violations of UCL, Bus. & Prof. Code § 17200, et seq.**

143.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

144.    Defendants' conduct constitutes unlawful, unfair, and fraudulent business acts or practices in violation of California's Unfair Competition Law, California Business & Professions Code § 17200, et seq. (the "UCL").

145.    Defendants' business practices are unlawful because, as detailed through this complaint, they constitute (1) violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder; (2) numerous violations of the CLRA; (3) UCL violations for Unfair Business Practices; (4) Violations of Cal. Bus. & Prof. Code § 17500 for False Advertising; and/or (4) Negligent Misrepresentation.

146.    A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.  A business act or practice is also "unfair" under the UCL if Defendants' conduct or practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

147.    A business act or practice is also "unfair" under the UCL where the consumer injury is substantial; the injury is not outweighed by any countervailing benefits to consumers or competition; and the injury is one that consumers themselves could not reasonably have avoided.

148.    Defendants' conduct as detailed herein constitutes unfair business acts and practices.

149.    Throughout the Class Period, Defendants enticed Plaintiff and the Class to use their services by trading securities through their platform by prominently representing that all Robinhood trades are "commission-free" and representing to the public that their order execution quality matched or beat their competitors.

150.    These representations were false and made despite Defendants knowing that they were receiving most of their income through backdoor payment for order flow—the costs of which were passed onto consumers—and despite that fact that Robinhood's order execution quality was substantially worse than its competitors in many material respects.

151.    By March of 2019, Defendants' own internal studies definitively confirmed the inferiority

of its execution quality; yet Defendants continued to mislead consumers until at least June 2019, and Defendants continued to provide substandard execution quality to millions of customers by charging unusually high payment for order fees to its vendors.

152.    Defendants owed Plaintiff and the Class a well-established duty of best execution. However, Defendants knowingly breached this duty in order to unfairly gain advantage over its business competitors through Defendants' misleading promise of "commission-free" trading services that were knowingly offset by undisclosed backdoor fees that were passed along to consumers.

153.    Defendants' misleading "commission-free" guarantee is largely and ultimately illusory, as any benefit their clients obtain from Defendants' purportedly "commission-free" trading are undermined, and in many cases exceeded, by the significant costs of substandard execution quality.

154.    Plaintiff and other Class members had no way of reasonably knowing that they were receiving substandard execution quality on their purportedly "commission-free" orders.

155.    The harm and consequences of Defendants' conduct as detailed herein outweigh any justification, motive or reason for Defendants' conduct.  Defendants' conduct is and continues to be unlawful, immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff and the Class. Further, Defendants' actions are a fraud to the public markets, as the misleading and substandard trading execution quality adversely impacts the values of all securities for which Defendants engage in trading activities.

156.    Defendants' business practices, as described herein, also are "fraudulent" because they are likely to deceive the general public and because Defendants falsely represented that their services have characteristics they do not have, namely, best execution; falsely represented that their services are of a particular standard when they are of another; advertised their services with intent not to sell them as advertised; represented that the subject of a transaction was supplied in accordance with a previous representation when it was not; and/or made material omissions regarding the quality of their services.

157.    Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendants not engaged in unlawful business practices and/or unfair competition, including by ordering restitution of all funds that Defendants may have acquired as a result of these practices.

158. Plaintiff further requests an injunction prohibiting further legal violations, including but not limited to requiring Defendants to disclose and itemize all charges and fees bearing upon the execution quality experienced by their clients and a cease and desist order requiring Defendants to remove, retract, and/or correct all materially misleading statements and omissions regarding "commission-free" trading when Defendants in fact charges back door commissions through their demand of substantial payment for order flow.

159. Defendants' conduct has caused substantial injury to Plaintiff and other Class members, and that injury is not outweighed by any countervailing benefits to consumers.

160. Plaintiff and the Class could not have reasonably avoided such injury.

161. As a result of Defendants' unlawful, unfair, and fraudulent business acts and practices, Plaintiff and other Class Members have suffered injury in fact and lost money or property.

162. Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendants not engaged in unfair competition, including by ordering restitution of all funds that Defendants may have acquired as a result of these practices and an injunction prohibiting further unfair business practices.

## FOURTH CAUSE OF ACTION

### Violations of FAL, Bus. & Prof. Code § 17500, et seq.

163. Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

164. From at least September 2016 to June 2019, Defendants, with the intent to directly or indirectly perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public, Plaintiff, and the putative class, statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Defendants knew or in the exercise of reasonable care should have known were untrue or misleading, in violation of Business and Professions Code section 17500, et seq.

165. Separately and in addition, Defendants knowingly made the false and misleading statements and omissions discussed in this complaint as part of a plan or scheme with the intent not to provide the services advertised.

166. Robinhood prominently featured its unlimited "commission-free" trading, while knowingly refusing to disclose backend fees that uniformly caused substandard execution quality to its millions of customers.

167. Such false and/or misleading statements include but are not limited to all of the representations set forth and discussed in the previous paragraphs of this complaint, all of which are incorporated herein by this reference.

168. Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendants not engaged in false advertising, including by ordering restitution of all funds that Defendants may have acquired as a result of these practices and an injunction prohibiting further misleading practices.

**FIFTH CAUSE OF ACTION**

**Negligent Misrepresentation**

169. Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

170. Defendants represented to Plaintiff that a material fact was true; namely, that if they placed orders through Robinhood, they would receive commission-free trading at an execution quality that matched or exceeded the execution quality of Robinhood's competitors.

171. Defendants' representation and warranty was not true, as their clients routinely received substandard execution quality due to the payment for order flow demands made by Robinhood as a prerequisite to sending order flow to its vendor electronic market makers.

172. Defendants knew about their payment for order flow scheme and that these payments necessarily caused substandard execution quality for their clients. Yet, as stated above, Defendants intentionally concealed their payment for order flow demands from consumers, including how Robinhood's payment for order flow plan, practice, and scheme affected the execution quality of orders placed on the Robinhood platform.

173. Defendants never intended to provide the promised services on a "commission-free" basis, as Defendants knowingly used their clients' order flow as specific leverage to extract specific payments from third parties for the right to process each of Defendants' clients' orders.

174. Even if Defendants believed that the representations were true, Defendants had no

25

reasonable grounds for believing that they were true when made given the way Robinhood's backdoor payment for order flow costs and charges would necessarily be passed onto their clients by third party electronic market makers.

175. The electronic market makers could have, and were otherwise obligated to, offer Defendants' clients better execution quality, if not for Defendants' payment for order flow scheme.

176. Defendants intended that Plaintiff and the Class would rely on their representations regarding "commission-free" trading so that they would use the Robinhood platform to order trades and other market transactions.

177. Plaintiff and the Class reasonably relied on Defendants' representations in using Robinhood's trading services and making orders on the Robinhood platform.

178. Plaintiff and the Class were harmed through fraudulent inducement.

179. Plaintiff's and the Class' reliance on Defendants' representations was a substantial factor in causing their harm.

180. As a result of Defendants' misrepresentation(s), Plaintiff and other Class Members have been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

181. Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

182. Defendants unfairly interfered with Plaintiff's and Class members' rights to receive the full benefits of their trades on Defendants' platform to which they were entitled by, *inter alia*, failing to provide adequate trade execution quality by prioritizing their profits through payment for order flow at the expense of their customers.

183. Defendants' conduct has breached the implied covenant of good faith and fair dealing because they have caused and continue to cause Plaintiff and the Class harm, loss, and damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Breach of Fiduciary Duty

184. Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

26

185.    As providers of financial services and registered securities investment dealers, Defendants were fiduciaries to Plaintiff and the Class, owing them the highest good faith and integrity in performing financial services and acting as securities brokers on their behalf.

186.    Defendants also maintain discretionary control over customer accounts and take commissions for exercising such discretionary actions, thus assuming all the fiduciary responsibilities associated with their retention of discretion to exercise trades and other transactions with or without customer direction.

187.    Defendants breached their fiduciary duties to Plaintiff and the Class by, *inter alia*, failing to provide adequate trade execution quality by prioritizing their profits through payment for order flow at the expense of their customers.

188.    Defendants' conduct has caused and continues to cause Plaintiff and Class members harm, loss, and damages by having breached and continuing to breach their fiduciary duties in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the class of similarly situated individuals, requests the Court to:

(a)    Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiff as representative of the class and designate counsel of record as class counsel;

(b)    Order Defendants to provide actual damages and equitable monetary relief (including restitution) to Plaintiff and class members and/or order Defendants to disgorge profits they realized as a result of their unlawful conduct;

(c)    Order Defendants to pay punitive damages, as allowable by law, to Plaintiff and class members;

(d)    Declare Defendants' conduct unlawful and enter an order enjoining Defendants from continuing to engage in the conduct alleged herein;

(e)    For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND; CASE NO. 4:20-cv-9328-YGR

(f)     For costs of the proceedings herein;

(g)     For reasonable attorneys' fees as allowed by law; and

(h)     Award such other relief as the Court deems appropriate under the circumstances.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  May 17, 2021                                Respectfully submitted,

**AHDOOT & WOLFSON, PC**

*/s/ Robert Ahdoot*
Tina Wolfson (SBN 174806)
Robert Ahdoot (SBN 172098)
Bradley K. King (SBN 274399)
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com
bking@ahdootwolfson.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (SBN 276006)
Sarah N. Westcot (SBN 264916)
701 Brickell Ave, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
scott@bursor.com
swestcot@bursor.com

**LIDDLE & DUBIN, P.C**.
Nicholas A. Coulson (admitted *pro hac vice*)
Matthew Z. Robb (admitted *pro hac vice*)
975 E. Jefferson Ave.
Detroit, Michigan 48207
Tel: 313-392-0015
Fax: 313-392-0025
ncoulson@ldclassaction.com
mrobb@ldclassaction.com

*Plaintiff's Co-Lead Counsel*

**AFFIDAVIT OF ROBERT AHDOOT**

I, Robert Ahdoot, declare as follows:

1. I am an attorney with the law firm of Ahdoot & Wolfson, PC, counsel for Plaintiff in this action. I am admitted to practice law in California and before this Court, and am a member in good standing of the State Bar of California. This declaration is made pursuant to California Civil Code section 1780(d). I make this declaration based on my research of public records and upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2. Venue is proper in this Court because many of the acts and transactions giving rise to this action occurred in this District, and Defendants (1) are authorized and registered to conduct business in this District, (2) have intentionally availed themselves of the laws and markets of the State of California through the distribution and sale of their services in this District, and (3) are headquartered in this District.

3. Plaintiff Ji Kwon is resident of Camarillo, California.

4. Defendant Robinhood Financial LLC is a Delaware limited liability company with its principal place of business located at 85 Willow Road, Menlo Park, California.

5. Defendant Robinhood Securities, LLC is a Delaware limited liability company with its principal place of business located at 85 Willow Road, Menlo Park, California.

6. Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business located at 85 Willow Road, Menlo Park, California.

I declare under penalty of perjury under the laws of the United States and the State of California this 17th day of May, 2021 in Burbank, California that the foregoing is true and correct.


       */s/ Robert Ahdoot*
       Robert Ahdoot

EXHIBIT 3

Revised February 5, 2020

## Robinhood Financial LLC & Robinhood Securities, LLC
## Customer Agreement

In consideration of Robinhood Financial LLC, Robinhood Securities, LLC, and their agents and assigns (collectively, "Robinhood") opening one or more accounts on my behalf ("My Account(s)" or the "Account(s)") for the purchase, sale or carrying of securities or contracts relating thereto and/or the borrowing of funds, which transactions are cleared through Robinhood Securities, I represent and agree with respect to all Accounts, whether margin or cash, to the terms set forth below (the "Agreement"). When used in this Agreement, the words "I", "Me", "My", "We", or "Us" mean the owner(s) of the Account. For purposes of this Agreement, Business Days are Monday through Friday, excluding federal holidays. Any references to "days" found in this Agreement are calendar days unless indicated otherwise.

**I UNDERSTAND THAT THE TERMS AND CONDITIONS OF THIS AGREEMENT GOVERN ALL ASPECTS OF MY RELATIONSHIP WITH ROBINHOOD REGARDING MY ACCOUNTS. I WILL CAREFULLY READ, UNDERSTAND AND ACCEPT THE TERMS AND CONDITIONS OF THIS AGREEMENT BEFORE I CLICK "SUBMIT APPLICATION" OR OTHER SIMILARLY WORDED BUTTON. IF I HAVE ANY QUESTIONS ABOUT ANY OF THE PROVISIONS IN THIS AGREEMENT, I WILL EMAIL HELP@ROBINHOOD.COM. I UNDERSTAND THAT CLICKING "SUBMIT APPLICATION" IS THE LEGAL EQUIVALENT OF MY MANUALLY SIGNING THIS AGREEMENT AND I WILL BE LEGALLY BOUND BY ITS TERMS AND CONDITIONS. BY ENTERING INTO THIS AGREEMENT, I ACKNOWLEDGE RECEIPT OF THE ROBINHOOD PRIVACY POLICY AND PRIVACY AND SECURITY STATEMENT. I UNDERSTAND THAT THIS AGREEMENT MAY BE AMENDED FROM TIME TO TIME BY ROBINHOOD, WITH REVISED TERMS POSTED ON THE ROBINHOOD WEBSITE. I AGREE TO CHECK FOR UPDATES TO THIS AGREEMENT. I UNDERSTAND THAT BY CONTINUING TO MAINTAIN MY SECURITIES BROKERAGE ACCOUNT WITHOUT OBJECTING TO ANY REVISED TERMS OF THIS AGREEMENT, I AM ACCEPTING THE TERMS OF THE REVISED AGREEMENT AND I WILL BE LEGALLY BOUND BY ITS TERMS AND CONDITIONS. IF I REQUEST OTHER SERVICES PROVIDED BY ROBINHOOD THAT REQUIRE ME TO AGREE TO SPECIFIC TERMS AND CONDITIONS ELECTRONICALLY (THROUGH CLICKS OR OTHER ACTIONS) OR OTHERWISE, SUCH TERMS AND CONDITIONS WILL BE DEEMED AN AMENDMENT AND WILL BE INCORPORATED INTO AND MADE PART OF THIS AGREEMENT. I ALSO UNDERSTAND THAT BY CLICKING "SUBMIT APPLICATION" I HAVE ACKNOWLEDGED THAT THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE IN SECTION 37 HEREIN.**

1.   **Capacity and Status.** If an individual, I am of legal age under the laws of the state where I reside and authorized to enter into this Agreement. If an entity, I am duly formed, validly existing and in good standing in My state of organization, have full power and authority to enter and perform this Agreement, and the persons signing the account application are fully authorized to act on My behalf. No person, except Myself, has any interest in the Account

opened pursuant to this Agreement.  I acknowledge that unless Robinhood receives written objection from Me, Robinhood may provide My name, address, and securities positions to requesting companies in which I hold securities.  Except as otherwise disclosed to Robinhood in writing, neither I nor any member of My immediate family is an employee of any exchange, any corporation of which any exchange owns a majority of the capital stock, a member of any exchange or self-regulatory organization, a member of any firm or member corporation registered on any exchange, a bank, trust company, insurance company or any corporation, firm or individual engaged in the business of dealing either as a broker-dealer or as principal in securities.  I understand and agree that I am obligated to promptly notify Robinhood in writing if I or a member of My immediate family becomes registered or employed in any of the above-described capacities.  Except as otherwise disclosed to Robinhood in writing, I am not a Professional (as defined below).  I further agree to promptly notify Robinhood in writing if I am now or if I become a Professional or an officer, director or 10% stockholder of any publicly traded company.

**2.** **Market Data.**  Robinhood may choose to make certain market data available to Me pursuant to the terms and conditions set forth in this Agreement.  By executing this Agreement, I agree to comply with those terms and conditions.

A. Definitions.

1) "Market Data" means (a) last sale information and quotation information relating to securities that are admitted to dealings on the New York Stock Exchange ("NYSE"), (b) such bond and other equity last sale and quotation information, and such index and other market information, as United States-registered national securities exchanges and national securities associations (each, an "Authorizing SRO") may make available and as the NYSE may from time to time designate as "Market Data"; and (c) all information that derives from any such information.

2) "Nonprofessional" means any natural person who receives market data solely for his/her personal, non- business use and who is not a "Professional." A "Professional" includes an individual who, if working in the United States, is: (i) registered or qualified with the Securities and Exchange Commission (the "SEC"), the Commodity Futures Trading Commission (the "CFTC"), any state securities agency, any securities exchange or association, or any commodities or futures contract market or association; (ii) engaged as an "investment advisor" as that term is defined in Section 202 (a) (11) of the Investment Advisers Act of 1940 (whether or not registered or qualified under that Act), or (iii) employed by a bank or other organization exempt from registration under federal and/or state securities laws to perform functions that would require him or her to be so registered or qualified if he or she were to perform such functions for an organization not so exempt.  A person who works outside of the United States will be considered a "Professional" if he or she performs the same functions as someone who would be considered a "Professional" in the United States.

2

B. <u>Provisions Applicable to All Users</u>.

1) <u>Proprietary Nature of Data</u>. I understand and acknowledge that each Authorizing SRO and Other Data Disseminator (as defined below) has a proprietary interest in the Market Data that originates on or derives from it or its market(s). I agree not to reproduce, distribute, sell or commercially exploit the Market Data in any manner.

2) <u>Enforcement</u>. I understand and acknowledge that (a) the Authorizing SROs are third-party beneficiaries under this Agreement and (b) the Authorizing SROs or their authorized representative(s) may enforce this Agreement, by legal proceedings or otherwise, against Me or any person that obtains Market Data that is made available pursuant to this Agreement other than as this Agreement contemplates.

3) <u>Data Not Guaranteed</u>. I understand that neither Robinhood nor any Authorizing SRO, other entity whose information is made available over the Authorizing SROs' facilities (an "Other Data Disseminator"), or information processor that assists any Authorizing SRO or Other Data Disseminator in making Market Data available (collectively, the "Disseminating Parties") guarantees the timeliness, sequence, accuracy, completeness, reliability, or content of Market Data or of other market information or messages disseminated to or by any Disseminating Party. I understand that neither Robinhood Financial nor any Disseminating Party guarantees the timeliness, sequence, accuracy, completeness, reliability or content of market information, or messages disseminated to or by any party. I understand that neither Robinhood Financial nor any Disseminating Party warrants that the service provided by any such entity will be uninterrupted or error-free. I further understand that Market Data by Xignite provides market data to Robinhood Financial customers. NEITHER ROBINHOOD FINANCIAL, ANY OF ITS AFFILIATES, THEIR RESPECTIVE OFFICERS OR EMPLOYEES, NOR ANY DISSEMINATING PARTY SHALL BE LIABLE IN ANY WAY FOR (A) ANY INACCURACY, ERROR OR DELAY IN, OR OMISSION OF, (I) ANY MARKET DATA, INFORMATION OR MESSAGE, OR (II) THE TRANSMISSION OR DELIVERY OF ANY SUCH DATA, INFORMATION OR MESSAGE; OR (B) ANY LOSS (AS DEFINED IN THIS AGREEMENT) OR DAMAGE ARISING FROM OR OCCASIONED BY (I) ANY SUCH INACCURACY, ERROR, DELAY OR OMISSION, (II) NON-PERFORMANCE OR III) INTERRUPTION IN ANY SUCH MARKET DATA, INFORMATION, OR MESSAGE, WHETHER DUE TO ANY ACT OR OMISSION BY ROBINHOOD FINANCIAL, ANY OF ITS AFFILIATES, THEIR RESPECTIVE OFFICERS OR EMPLOYEES, OR ANY DISSEMINATING PARTY, OR TO ANY "FORCE MAJEURE" (E.G., FLOOD, EXTRAORDINARY WEATHER CONDITIONS, EARTHQUAKE OR OTHER ACT OF GOD, FIRE, WAR, INSURRECTION, RIOT, LABOR DISPUTE, ACCIDENT, ACTION OF

3

GOVERNMENT, OR COMMUNICATIONS OR POWER FAILURE, EQUIPMENT OR SOFTWARE MALFUNCTION) OR ANY OTHER CAUSE BEYOND THE REASONABLE CONTROL OF ROBINHOOD FINANCIAL, ITS AFFILIATES, THEIR RESPECTIVE OFFICERS AND EMPLOYEES, OR ANY DISSEMINATING PARTY.

4)   <u>Permitted Use</u>.  I shall not furnish Market Data to any other person or entity. If I receive Market Data other than as a Nonprofessional, I shall use Market Data only for My individual use.

5)   <u>Dissemination, Discontinuance, or Modification</u>.  I understand and acknowledge that, at any time, the Authorizing SROs may discontinue disseminating any category of Market Data, may change or eliminate any transmission method and may change transmission speeds or other signal characteristics.  The Authorizing SROs shall not be liable for any resulting liability, loss or damages that may arise therefrom.

6)   <u>Duration; Survival</u>.  This Section 2 of this Agreement remains in effect for so long as I have the ability to receive Market Data as contemplated by this Section 2.  In addition, Sections 2(B)(1)-(3) and the first two sentences of Section 2(B)(7), survive any termination of this Agreement.

7)   <u>Miscellaneous</u>.  The laws of the State of New York shall govern this Section 2 and it shall be interpreted in accordance with those laws.  This Subsection is subject to the Securities Exchange Act of 1934, the rules promulgated under that act, and the joint-industry plans entered into pursuant to that act.

C.   <u>Provisions Applicable to Nonprofessionals</u>.

1)   <u>Permitted Receipt</u>.  I understand that I may not receive Market Data from Robinhood as a Nonprofessional, and Robinhood may not provide Market Data to Me as a Nonprofessional, unless Robinhood first properly determines that I qualify as a Nonprofessional as defined above and I in fact qualify as a Nonprofessional.  I agree that, as a prerequisite to Robinhood Financial qualifying Me as a Nonprofessional, I will provide to Robinhood truthful and accurate information about Me, such as: my occupation, employer, employment position and functions; my use of Market Data; my registration status with any securities agency, exchange, association, or regulatory body, or any commodities or future contract market, association, or regulatory body, whether in the United States or elsewhere; and any compensation of any kind I may receive from any individual or entity for my trading activities, asset management, or investment advice.  Except as otherwise declared to Robinhood in writing, by executing this Agreement, I certify that I meet the definition of Nonprofessional as set forth in this Agreement.

2)   Permitted Use.  If I am a Nonprofessional, I agree to receive Market Data solely for my personal, non-business use.

3)   Notification.  I shall notify Robinhood promptly in writing of any change in my circumstances that may cause Me to cease to qualify as a Nonprofessional.

**3.   NASDAQ OMX Information.**

A.   Definitions.

1)   "Information" means certain market data and other data disseminated that has been collected, validated, processed, and recorded by any system NASDAQ OMX has developed for the creation or dissemination of Information or other sources made available for transmission to and receipt from either a distributor such as RHF or from NASDAQ OMX relating to: a) eligible securities or other financial instruments, markets, products, vehicles, indicators, or devices; b) activities of a NASDAQ OMX company; c) other information and data from a NASDAQ OMX company. "Information" also includes any element of Information as used or processed in such a way that the Information can be identified, recalculated or re-engineered from the processed Information or that the processed Information can be used as a substitute for Information.

2)   "NASDAQ OMX" means The NASDAQ OMX Group, Inc., a Delaware limited liability company and its subsidiaries and Affiliates (collectively, "NASDAQ OMX").

B.   Use of Data.  I understand that I may use the Information only for personal use and not for any business purpose.  I may not sell, lease, furnish or otherwise permit or provide access to the Information to any other natural person or entity ("Person") or to any other office or place.  I will not engage in the operation of any illegal business use or permit anyone else to use the Information, or any part thereof, for any illegal purpose or violate any NASDAQ OMX or SEC Rule or any FSA rule or other applicable law, rule or regulation.  I may not present the Information rendered in any unfair, misleading or discriminatory format.  I shall take reasonable security precautions to prevent any Person other than Myself from gaining access to the Information.

C.   Proprietary Data.  I acknowledge and agree that NASDAQ OMX has proprietary rights to the Information that originates on or derives from markets regulated or operated by NASDAQ OMX, and compilation or other rights to Information gathered from other sources.  I further acknowledge and agree that NASDAQ OMX's third-party information providers have exclusive proprietary rights to their respective Information.  In the event of any misappropriation or misuse by Me or anyone who accesses the Information through Me, NASDAQ OMX or its third-

party information providers shall have the right to obtain injunctive relief for its respective materials.

D. <u>System</u>. I acknowledge that NASDAQ OMX, in its sole discretion, may from time-to-time make modifications to its system or the Information. Such modifications may require corresponding changes to be made in Robinhood Financial's service. Changes or the failure to make timely changes by Me may sever or affect My access to or use of the Information. I understand that neither NASDAQ OMX nor Robinhood shall be responsible for such effects.

E. <u>NASDAQ OMX Limitation of Liability</u>. Except as may otherwise be set forth herein, NASDAQ OMX shall not be liable to Me for indirect, special, punitive, consequential or incidental loss or damage (including, but not limited to, trading losses, lost profits, or other indirect loss or damage) of any nature arising from any cause whatsoever, even if NASDAQ OMX has been advised of the possibility of such damages. NASDAQ OMX shall not be liable to Me for any unavailability, interruption, delay, incompleteness or inaccuracy of the Information. This Section shall not relieve NASDAQ OMX or Me from liability for damages that result from their own gross negligence or willful tortious misconduct or from personal injury or wrongful death claims. I agree that the terms of this Section reflect a reasonable allocation of risk and limitation of liability.

F. <u>Disclaimers of Warranties</u>. NASDAQ OMX and its third-party information providers make no warranties of any kind with respect to the Information—express, implied or statutory (including without limitation, timeliness, truthfulness, sequence, completeness, accuracy, freedom from interruption), any implied warranties arising from trade usage, course of dealing, course of performance or the implied warranties of merchantability or fitness for a particular use or purpose or noninfringement.

G. <u>Termination by NASDAQ OMX</u>. I acknowledge that NASDAQ OMX, when required to do so in fulfillment of statutory obligations, may by notice to Robinhood unilaterally limit or terminate the right of any or all Persons to receive or use the Information and that Robinhood will comply with any such notice and will terminate or limit the furnishing of the Information.

**4. Authorization.** I understand that My Account is self-directed. Accordingly, I appoint Robinhood Financial as My agent for the purpose of carrying out My directions to Robinhood Financial in accordance with the terms and conditions of this Agreement and any attendant risks with respect to the purchase or sale of securities. Robinhood Financial is authorized to open or close My Account(s), place and withdraw orders and take such other steps as are reasonable to carry out My directions. All transactions will be effected only on My order or the order of My authorized delegate, except as described in Section 10. I understand Robinhood Financial provides trading and brokerage services through the Robinhood website (the "Website") and the Robinhood mobile application (the "App"). I agree to receive and transmit financial information through such electronic means. My use

or My grant of access to My Account to any third party to access information or place transactions in My Account is solely at My risk.

**5.      Customer Representations and Responsibilities.**

(A)     <u>Self-directed Account</u>.  I understand that My Account is self-directed, and so that I am solely responsible for any and all orders placed in My Account and that all orders entered by Me or on My behalf are unsolicited and based on My own investment decisions or the investment decision of My duly authorized representative or agent.  Accordingly, I agree that neither Robinhood nor any of its employees, agents, principals, or representatives:

1)      provide investment advice in connection with this Account;
2)      recommend any security, transaction or order;
3)      solicit orders;
4)      act as a market maker in any security;
5)      make discretionary trades; and
6)      produce or provide first-party research providing a specific investment strategies such as buy, sell or hold recommendations, first-party ratings and/or price targets.  To the extent research materials or similar information are available through the App or the Website or the websites of any entity controlled by, controlling, or under common control with Robinhood (such entity, an "Affiliate"), I understand that these materials are intended for informational and educational purposes only and they do not constitute a recommendation to enter into any securities transactions or to engage in any investment strategies.

(B)     <u>Information Accuracy</u>.  I:  (i) certify that the information contained in this Agreement, the account application, and any other document that I furnish to Robinhood Financial in connection with My Account(s) is complete, true and correct, and acknowledge that knowingly giving false information for the purpose of inducing Robinhood Financial to extend credit is a federal crime; (ii) authorize Robinhood Financial to contact any individual or firm noted herein or on the documents referred to in subsection (i) of this Section and any other normal sources of debit or credit information; (iii) authorize anyone so contacted to furnish such information to Robinhood Financial as Robinhood may request; and (iv) agree that this Agreement, the account application and any other document I furnish in connection with My Account is Robinhood's property, as the case may be.  I shall promptly advise Robinhood Financial of any changes to the information in such agreements and documents in writing within ten (10) calendar days.  I authorize Robinhood Financial to obtain reports and provide information to others concerning My creditworthiness and business conduct.  Upon My request, Robinhood agrees to provide Me a copy of any report so obtained.  Robinhood may retain this Agreement, the Account application, and all other such documents and their respective records at Its sole discretion, whether or not credit is extended.

7

(C)     Risks.  I understand that all investments involve risk, that losses may exceed the principal invested, and that the past performance of a security, industry, sector, market, or financial product does not guarantee future results or returns.

(D)     Account Defaults.  I understand that My Account comes with many defaulted service instruction features and preferences.  I further understand that I am not required to use these defaulted options or preferences and that once My Account is approved and opened I have the sole discretion to control and adjust such defaulted service preferences that relate to My account.

(E)     Knowledge of Account.  I understand that I am solely responsible for knowing the rights and terms for all securities purchased, sold and maintained in My Account including mergers, reorganizations, stock splits, name changes or symbol changes, dividends, option symbols, and option deliverables.  I further understand that certain securities may grant Me valuable rights that may expire unless I take specific action.  These securities include bonds, convertible securities, warrants, stock rights and securities subject to exchange offers or tenders.  I am responsible for knowing all expiration dates, redemption dates, and the circumstances under which rights associated with My securities may be called, cancelled, or modified. Robinhood may, but are not obligated to, notify Me of any upcoming expiration or redemption dates, or take any action on My behalf without My specific instructions except as required by law and the rules of regulatory authorities.  I acknowledge that Robinhood may adjust My Account to correct any error.  If My Account has an option position on the last trading day prior to expiration, which is one cent or more in the money, Robinhood Financial will generally exercise the option, on My behalf.  However, Robinhood Financial reserves the right at Its discretion to close any option position prior to expiration date or any position resulting from the exercising/assignment after option expiration.  I will be charged a commission for any such transaction.  Robinhood Financial is not obligated to take any of these actions and Robinhood Financial is not liable for Losses should it not take them.

(F)     Purchases.  All orders for the purchase of securities given for My Account will be authorized by Me and executed in reliance on My promise that an actual purchase is intended.  It is My obligation to pay for purchases immediately or on Robinhood's demand.  I understand Robinhood may at any time, in its sole discretion and without prior notice to Me, prohibit or restrict My ability to trade securities.  I further agree not to allow any person to trade for My Account unless a trading authorization for that person has been received and approved by Robinhood.  Robinhood reserve the right to require full payment in cleared funds prior to the acceptance of any order.  In the event that I fail to provide sufficient funds, Robinhood may, at its option and without notice to Me, i) charge a reasonable rate of interest, ii) liquidate the Property subject of the buy order, or iii) sell other Property owned by Me and held in any of My Accounts.  Robinhood may also charge any consequential Loss to My Account.  For purposes of this Agreement, "Property" shall mean all monies, contracts, investments and options, whether for present or future delivery, and all related distributions, proceeds, products and accessions.

8

(G)     <u>Sales/Short Sales</u>.  I promise to deliver all securities sold in My Account and to provide collateral of a type and amount acceptable to Robinhood Financial for all short sales in My Account.  Robinhood Financial requires that a security be held in My Account prior to the acceptance of a sell order with respect to such security unless the order is specifically designated as a "short sale." If a security is not held in My Account and a sell order is processed, I must promptly deliver such security to Robinhood Financial for receipt in good deliverable form on or before the settlement date.  Any order accepted without negotiable certificates or positions in My Account will be subject, at Robinhood Financial's sole discretion, to cancellation or buy-in.  To ensure this will not occur, I agree to only place sell orders for securities owned by Me and held in My Account at the time My order is placed.

Proceeds of a sale will not be paid to Me or released into My Account until Robinhood Financial has received the security in good deliverable form, whether from a transfer agent or from Me and the settlement of the security is complete.  If the security is not received on or before settlement date, or as market conditions warrant, Robinhood Financial may in its sole discretion purchase the security on the open market for My Account and may liquidate and close out any and all securities in My Account in order to pay for such purchase.  In the event a security is bought in, I will be responsible for all resulting Losses incurred by Robinhood Financial.

I understand that I may execute short sales only in a margin Account and that such execution must comply with applicable short sales rules.

(H)     <u>Assistance by Robinhood</u>.  I understand that when I request assistance from Robinhood or its employees in using the investment tools available on the Website or the App, it will be limited to an explanation of the tool's functionality and, if requested by Me, to the entry by Robinhood or its employees of variables provided by Me, and that such assistance does not constitute investment advice, an opinion with respect to the suitability of any transaction, or solicitation of any orders.

(I)     <u>No Tax or Legal Advice</u>.  I understand that Robinhood does not provide tax or legal advice.

(J)     <u>Discontinuation of Services</u>.  I understand that Robinhood may discontinue My Account and any services related to My Account immediately by providing written notice to Me

(K)     <u>Electronic Access</u>.

1)      I am solely responsible for keeping My Account numbers and PINs confidential and will not share them with third parties.  "PINs" shall mean My username and password.

9

2)      I agree and accept full responsibility for monitoring and safeguarding My Accounts and access to My Accounts.

3)      I agree to immediately notify Robinhood in writing, delivered via e-mail and a recognized international delivery service, if I become aware of: (i) any loss, theft, or unauthorized use of My PINs or Account numbers; (ii) any failure by Me to receive any communication from Robinhood indicating that an order was received, executed or cancelled, as applicable; (iii) any failure by Me to receive an accurate written confirmation of an order, execution, or cancellation; (iv) any receipt by Me of confirmation of an order, execution or cancellation, which I did not place; (v) any inaccurate information in or relating to My orders, trades, margin status, Account balances, deposits, withdrawals, securities positions or transaction history; or (vi) any other unauthorized use or access of My Account.

4)      Each of the events described in subsections (K)(3)(i)-(vi) shall be deemed a "Potential Fraudulent Event".  The use and storage of any information including My Account numbers, PINs, portfolio information, transaction activity, account balances and any other information or orders available on My wireless, web-enabled cellular telephone or similar wireless communications device (collectively, "Mobile Device") or My personal computer is at My own risk and is My sole responsibility.  I represent that I am solely responsible for and have authorized any orders or instructions appearing in, originating from, or associated with My Account, My Account number, My username and password, or PINs.  I agree to notify Robinhood immediately after I discover any Potential Fraudulent Event, but in no event more than twenty-four (24) hours following discovery.  Upon request by Robinhood, I agree to report any Potential Fraudulent Event promptly to legal authorities and provide Robinhood a copy of any report prepared by such legal authorities.  I agree to cooperate fully with the legal authorities and Robinhood in any investigation of any Potential Fraudulent Event and I will complete any required affidavits promptly, accurately and thoroughly. I also agree to allow Robinhood access to My Mobile Device, My computer, and My network in connection with Robinhood's investigation of any Potential Fraudulent Event.  I understand that if I fail to do any of these things I may encounter delays in regaining access to the funds in My Account.  I agree to indemnify and hold Robinhood, its Affiliates, and Robinhood and its Affiliates' respective officers, directors, and employees harmless from and against any Losses arising out of or relating to any Potential Fraudulent Event.  I acknowledge that Robinhood does not know when a person entering orders with My username and password is Me.

5)      Trusted Contact Person.  I understand that, pursuant to FINRA regulations, Robinhood is authorized to contact the Trusted Contact Person (as defined by FINRA Rule 4512) designated for My Account and to disclose information about My account to address possible financial exploitation, to confirm the specifics of My current contact information, health status, or

10

the identity of any legal guardian, executor, trustee or holder of a power of attorney, or as otherwise permitted by Rule 2165.

6. **Clearance of Trades.** I understand that Robinhood Financial has entered into a clearing agreement with Robinhood Securities whereby Robinhood Financial will introduce My Account to Robinhood Securities, and Robinhood Securities will clear all transactions, on a fully-disclosed basis. I understand that Robinhood Securities carries My Account(s) and is responsible for the clearing and bookkeeping of transactions, but is not otherwise responsible for the conduct of Robinhood Financial.

Until receipt from Me of written notice to the contrary, Robinhood Securities may accept from Robinhood Financial, without inquiry or investigation, (i) orders for the purchase or sale of securities and other property on margin, if I have elected to have a margin account, or otherwise, and (ii) any other instructions concerning my Accounts. Robinhood Securities shall look solely to Robinhood Financial unless otherwise directed by Robinhood Financial, and not to Me, with respect to any such orders or instructions; except that I understand that Robinhood Securities will deliver confirmations, statements, and all written or other notices with respect to My Account directly to Me with copies to Robinhood Financial, and that Robinhood Securities will look directly to Me or Robinhood Financial for delivery of margin, payment, or securities. I agree to hold Robinhood Securities harmless from and against any Losses arising in connection with the delivery or receipt of any such communication(s), provided Robinhood Securities has acted in accordance with the above. The foregoing shall be effective as to My Account(s) until written notice to the contrary is received from Me by Robinhood Securities or Robinhood Financial.

7. **Review of Confirmations and Statements.** I agree that it is My responsibility to review order execution confirmations and statements of My Account(s) promptly upon receipt. I agree to receive all confirmations and account statements, as well as all tax related documents, in electronic format. I understand that account statements will evidence all activity in My Account for the stated period, including securities transactions, cash balances, credits to My Account and all fees paid from My Account. Notwithstanding Section 35.B, confirmations will be considered binding on Me unless I notify Robinhood of any objections within two (2) calendar days from the date confirmations are sent. Account statements will be considered binding on Me unless I notify you of any objections within ten (10) calendar days after My Account statements are posted online. Such objection may be oral or in writing, but any oral objection must be immediately confirmed in writing. In all cases, Robinhood reserves the right to determine the validity of My objection. If I object to a transaction for any reason, I understand and agree that I am obligated to take action to limit any losses that may result from such transaction or I will bear sole responsibility for any losses relating to the transaction, even if My objection to the transaction is ultimately determined to be valid. Nothing in this Section 7 shall limit My responsibilities as described in Section 5 of this Agreement.

8. **Important Information Needed to Open a New Account.** To help the government better detect the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person

who opens an account.  Therefore, I understand that when I open My Account Robinhood will ask for My name, address, date of birth and other identifying information.  Robinhood may also ask copies of My driver's license, passport or other identifying documents.  I understand that Robinhood may take steps to verify the accuracy of the information I provide to Robinhood in My Account application or otherwise, and that Robinhood may restrict My access to My Account pending such verification.  I will provide prompt notification to Robinhood of any changes in the information including My name, address, e-mail address and telephone number.

I further understand that if I attempt to access My Account from a jurisdiction subject to certain U.S. sanctions or I am ordinarily resident in such a jurisdiction, or if you reasonably believe that I am attempting such access or have become a resident in such a jurisdiction, you may restrict My Account, and any pending orders may be cancelled. If this happens, I understand that I should contact help@robinhood.com, and that I may be asked to provide supplemental information as part of this process. I further understand that I must close My Account before establishing residency in any jurisdiction subject to U.S. sanctions.

9. **Telephone Conversations and Electronic Communications.**  I understand and agree that Robinhood may record and monitor any telephone or electronic communications with Me.  Unless otherwise agreed in writing in advance, Robinhood does not consent to the recording of telephone conversations by any third party or Me.  I acknowledge and understand that not all telephone or electronic communications are recorded by Robinhood, and Robinhood does not guarantee that recordings of any particular telephone or electronic communications will be retained or capable of being retrieved.

10. **Oral Authorization.**  I agree that Robinhood shall be entitled to act upon any oral instructions given by Me so long as Robinhood reasonably believes such instruction was actually given by Me or My authorized agent.

11. **Applicable Laws and Regulations.**  All transactions in My Account will be subject to federal securities laws and regulations, the applicable laws and regulations of any state or jurisdiction in which Robinhood Financial is registered, the rules of any applicable self-regulatory organization of which Robinhood Financial is a member and the rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed.  In no event will Robinhood Financial be obligated to effect any transaction it believes would violate any federal or state law, rule or regulation or the rules or regulations of any regulatory or self-regulatory organization.

12. **Erroneous Distributions.**  I agree to promptly return to Robinhood any assets erroneously distributed to Me.  In the event that I sell a security prior to its ex-dividend/distribution date, and I receive the related cash/stock dividend or distribution in error, I direct Robinhood on My behalf to pay such dividend/distribution to the entitled purchaser of the securities I sold, and I guarantee to promptly reimburse Robinhood for, or deliver to Robinhood, said dividend or distribution.

13. **Market Volatility; Market Orders; Limit Orders; and Queued Orders.**  I understand that, whether I place a market or limit order, I will receive the price at which My order is

executed in the marketplace, subject to any clarification stated below. Particularly during periods of high volume, illiquidity, fast movement or volatility in the marketplace, the execution price received may differ from the quote provided on entry of an order, and I may receive partial executions of an order at different prices. I understand that Robinhood Financial is not liable for any price fluctuations. I also understand that price quotes generally are for only a small number of shares as specified by the marketplace, and larger orders are relatively more likely to receive executions at prices that vary from the quotes or in multiple lots at different prices.

I understand that Robinhood Financial does not currently support sending traditional market buy orders and that Robinhood Financial collars all market buy orders by using limit orders priced up to 5% above the last trade price. This is not the case for market sell orders. I further understand that when I send a market buy order through Robinhood Financial's trading system, the trading system generates a limit order up to 5% above the last trade price, and then Robinhood Financial sends the order to an executing broker. I understand that Robinhood Financial's implementation of market buy orders may vary depending on prices of instruments, market conditions, and other factors. I further understand that Robinhood Financial uses the following rounding mechanics with respect to buy orders: the last trade price is (i) multiplied by 1.05; (ii) rounded down to two decimal places if the last trade price is over $1.00; otherwise, rounded down to four decimal places; and (iii) for securities included in the SEC's Tick Size Pilot Program, rounded down to the nearest $.05 increment. I understand that securities may open for trading at prices substantially higher or lower than the previous closing price or the anticipated price. If I place a market order (whether during normal market hours or when the market is closed), I agree to pay or receive the prevailing market price at the time My market order is executed, subject to the specific clarification above relating to buy orders. I understand that the price I pay may be significantly higher or lower than anticipated at the time I placed the order. To avoid buying a security at a higher price and possibly exceeding My purchasing power, I understand My option to enter a limit order. I also understand that limit orders may not be executed at any particular time, or at all, if there is not sufficient trading at or better than the limit price I specify, and are only good until the end of the trading day in which they are entered. The Website contains further information regarding order types and limitations, which I agree to read and understand before placing such orders.

As a customer of Robinhood Financial, I understand that after the market has closed for the day, I have the ability to place in a queue order requests to be executed the following day upon the opening of the market ("Queued Order"). I understand that My Queued Order request is prioritized based on the order in which it is received by Robinhood Financial, and that the Queued Order requests are sent out for execution shortly after the market opens on the next day of trading. I further understand that each Queued Order request is sent out per customer and per security as Robinhood Financial market orders (described above), and that they are not aggregated.

A limit order may be "good till cancelled" which means the order remains valid until (A) it is executed; (B) I cancel the order; (C) approximately 90 days from when the order is placed; or (D) the contract to which it relates is closed. I understand that Robinhood will

13

cancel a "good till cancelled" order at the end of every trading day (on the exchange on which the instrument to which the contract relates is traded) and place such order again at the start of the following trading day.  This process will be repeated every day for as long as the "good till cancelled" order remains valid.  I further agree that any "good till cancelled" orders I place should be treated as "do not reduce" orders.

14.     **Bulletin Board/Pink Sheet Stocks.**  Bulletin board, pink sheet and other thinly-traded securities (collectively "bulletin board stocks") present particular trading risks, in part because they are relatively less liquid and more volatile than actively traded securities listed on a major exchange.  I understand that bulletin board stocks may be subject to different trading rules and systems than other securities and that I may encounter significant delays in executions, reports of executions, and updating of quotations in trading bulletin board stocks.  Robinhood Financial in its sole discretion may require limit orders on certain bulletin board stock transactions.

15.     **Research and Internet Links.**  News, research, links to outside websites, and other information accessible through the App or Website ("Content") may be prepared by independent external providers not affiliated with Robinhood Financial, including Morningstar, Inc. (all such providers, the "Providers").  I agree not to distribute, reproduce, sell, or otherwise commercially use the Content in any manner.  I understand that Robinhood may terminate My access to the Content.  I understand that none of the Content is a recommendation by Robinhood to buy or sell any securities or to engage in any investment strategy.

16.     **Restrictions on Trading.**  I understand that Robinhood may, in its discretion, prohibit or restrict the trading of securities, or the substitution of securities, in any of My Accounts.  I understand that Robinhood may execute all orders by Me on any exchange or market, unless I specifically instruct Robinhood to the contrary.  In the event of a breach or default by Me under this Agreement, Robinhood shall have all rights and remedies available to a secured creditor under all applicable laws and in addition to the rights and remedies provided herein.  I understand that Robinhood may at any time, at its sole discretion and without prior notice to Me: (i) prohibit or restrict My access to the use of the App or the Website or related services and My ability to trade, (ii) refuse to accept any of My transactions, (iii) refuse to execute any of My transactions, or (iv) terminate My Account. The closing of My Account will not affect the rights or obligations of either party incurred prior to the date My Account is closed.

Further, Robinhood will not tolerate any foul or abusive language, physical violence, threatening behavior, or other inappropriate conduct directed toward Robinhood, its Affiliates' officers, employees, contractors or customers.  If I engage in any such behavior, as determined by Robinhood in its sole discretion, I agree that Robinhood is authorized to: (i) liquidate any securities, instruments or other property in My Account, (ii) send Me the proceeds, and (iii) close My account.  Robinhood will not be responsible for any Losses caused by the liquidation of securities, instruments or other property pursuant to this paragraph, including any tax liabilities.

17. **Waiver; Limitation of Liability; Indemnification.** I agree that My use of the App or the Website or any other service provided by Robinhood Financial or its Affiliates is at My sole risk. The Robinhood Financial service (including the App, the Website, the provision of Market Data, Information, Content, or any other information provided by Robinhood Financial, any of its Affiliates, or any third-party content provider or market data provider) is provided on an "as is," "as available" basis without warranties of any kind, either express or implied, statutory (including without limitation, timeliness, truthfulness, sequence, completeness, accuracy, freedom from interruption), implied warranties arising from trade usage, course of dealing, course of performance, or the implied warranties of merchantability or fitness for a particular purpose or application, other than those warranties which are implied by and incapable of exclusion, restriction or modification under the laws applicable to this Agreement.

Although considerable effort is expended to make the Website, App and other operational and communications channels available around the clock, Robinhood does not warrant that these channels will be available and error free every minute of the day. I agree that Robinhood will not be responsible for temporary interruptions in service due to maintenance, Website or App changes, or failures, nor shall Robinhood be liable for extended interruptions due to failures beyond our control, including but not limited to the failure of interconnecting and operating systems, computer viruses, forces of nature, labor disputes and armed conflicts.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, I UNDERSTAND AND AGREE THAT ROBINHOOD, ITS AFFILIATES, THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, AND THE PROVIDERS (COLLECTIVELY THE "ROBINHOOD PARTIES") WILL NOT BE LIABLE TO ME OR TO THIRD PARTIES UNDER ANY CIRCUMSTANCES, OR HAVE ANY RESPONSIBILITY WHATSOEVER, FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING TRADING LOSSES, DAMAGES, LOSS OF PROFITS, REVENUE, OR GOODWILL) THAT I MAY INCUR IN CONNECTION WITH MY USE OF THE SERVICE PROVIDED BY ROBINHOOD OR ANY OF ITS AFFILIATES UNDER THIS AGREEMENT (INCLUDING MY USE OF THE APP, THE WEBSITE, THE MARKET DATA, THE INFORMATION, OR THE CONTENT), BREACH OF THIS AGREEMENT, OR ANY TERMINATION OF THIS AGREEMENT, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, AND WHETHER OR NOT FORESEEABLE, EVEN IF ANY ROBINHOOD PARTY HAS BEEN ADVISED OR WAS AWARE OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES. THE ROBINHOOD PARTIES SHALL NOT BE LIABLE BY REASON OF DELAYS OR INTERRUPTIONS OF THE SERVICE OR TRANSMISSIONS, OR FAILURES OF PERFORMANCE OF THEIR RESPECTIVE SYSTEMS, REGARDLESS OF CAUSE, INCLUDING THOSE CAUSED BY GOVERNMENTAL OR REGULATORY ACTION, THE ACTION OF ANY EXCHANGE OR OTHER SELF REGULATORY ORGANIZATION, OR THOSE CAUSED BY SOFTWARE OR HARDWARE MALFUNCTIONS.

Except as otherwise provided by law, Robinhood or any of its affiliates or respective partners, officers, directors, employees or agents (collectively, "Indemnified Parties") shall not be liable for any expenses, losses, costs, damages, liabilities, demands, debts, obligations, penalties, charges, claims, causes of action, penalties, fines and taxes of any kind or nature (including legal expenses and attorneys' fees) (whether known or unknown, absolute or contingent, liquidated or unliquidated, direct or indirect, due or to become due, accrued or not accrued, asserted or unasserted, related or not related to a third party claim, or otherwise) (collectively, "Losses") by or with respect to any matters pertaining to My Account, except to the extent that such Losses are actual Losses and are determined by a court of competent jurisdiction or an arbitration panel in a final non-appealable judgment or order to have resulted solely from Robinhood's or any of its affiliates' gross negligence or intentional misconduct. In addition, I agree that the Indemnified Parties shall have no liability for, and I agree to indemnify, defend and hold harmless the Indemnified Parties from all Losses that result from: (i) any noncompliance by Me with any of the terms and conditions of this Agreement; (ii) any third-party actions related to My receipt and use of any Information, Market Data, Content, market analysis, other third-party content, or other such information obtained on the App or Website, whether authorized or unauthorized under this Agreement; (iii) any third-party actions related to My use of the App or the Website; (iv) My or My agent's misrepresentation or alleged misrepresentation, or act or omission; (v) Indemnified Parties following My or My agent's directions or instructions, or failing to follow My or My agent's unlawful or unreasonable directions or instructions; (vi) any activities or services of the Indemnified Parties in connection with My Account (including any technology services, reporting, trading, research or capital introduction services); or (vii) the failure by any person not controlled by the Indemnified Parties and their affiliates to perform any obligations to Me. Further, if I authorize or allow third parties to gain access to Robinhood's services, including My Accounts, I will indemnify, defend and hold harmless the Indemnified Parties against any Losses arising out of claims or suits by such third parties based upon or relating to such access and use. Robinhood does not warrant against loss of use or any direct, indirect or consequential damages or Losses to Me caused by My assent, expressed or implied, to a third party accessing My Account or information, including access provided through any other third party systems or sites.

I consent to the use of automated systems or service bureaus by Robinhood and its respective affiliates in conjunction with My Account, including automated order entry and execution, record keeping, reporting and account reconciliation and risk management systems (collectively "Automated Systems"). I understand that the use of Automated Systems entails risks, such as interruption or delays of service, errors or omissions in the information provided, system failure and errors in the design or functioning of such Automated Systems (collectively, a "System Failure") that could cause substantial damage, expense, or liability to Me. I understand and agree that Indemnified Parties will have no liability whatsoever for any of my Losses arising out of or relating to a System Failure.

I also agree that Indemnified Parties will have no responsibility or liability to Me in connection with the performance or non-performance by any exchange, clearing organization, market data provider, or other third party (including other broker-dealers and clearing firms, and banks) or any of their respective agents or affiliates, of its or their

16

obligations relative to any securities.  I agree that Indemnified Parties will have no liability, to Me or to third parties, or responsibility whatsoever for: (i) any Losses resulting from a cause over which Indemnified Parties do not have direct control, including the failure of mechanical equipment, unauthorized access, theft, operator errors, government restrictions, force majeure (as defined in this Agreement), market data availability or quality, exchange rulings or suspension of trading; and (ii) any special, indirect, incidental, consequential, punitive or exemplary damages (including lost profits, trading losses and damages) that I may incur in connection with My use of the App, the Website, Robinhood's brokerage, and other services provided by Indemnified Parties under this Agreement.

18.     **Mutual Fund Transactions.**  In the event that I purchase or hold a mutual fund, I agree to read and understand the terms of its prospectus.  I understand that certain mutual funds reserve the right to change their purchasing, switching or redemption procedures or suspend or postpone redemptions under certain market conditions.  I further understand that any mutual fund order entered with Robinhood is placed by Robinhood on a best efforts basis as prescribed and recognized by the individual fund, and that Robinhood is not responsible for unexecuted orders due to the failure of any communication system.  I agree to be fully responsible for the information contained within the mutual fund prospectus and to hold Robinhood, its Affiliates, and Robinhood and its Affiliates' respective officers and employees harmless for any deficiencies contained therein.  I authorize Robinhood to act as My agent in the purchase and redemption of fund shares.

19.     **Exchange Traded Funds.**  I understand that I should consider the investment objectives and unique risk profile of Exchange Traded Funds ("ETFs") carefully before investing, and that ETFs are subject to risks similar to those of other diversified portfolios.  I further understand that leveraged and inverse ETFs may not be suitable for all investors and may increase exposure to volatility through the use of leverage, short sales of securities, derivatives, and other complex investment strategies, and that although ETFs are designed to provide investment results that generally correspond to the performance of their respective underlying indices, they may not be able to exactly replicate the performance of the indices because of expenses and other factors.  I further understand that ETFs are required to distribute portfolio gains to shareholders at year end, which may be generated by portfolio rebalancing or the need to meet diversification requirements, and that ETF trading will also generate tax consequences.  I understand that I can obtain prospectuses from issuers or their third party agents who distribute and make prospectuses available for review.  Additional regulatory guidance on ETFs can be found here.

20.     **Effect of Attachment or Sequestration of Accounts.**  Robinhood shall not be liable for refusing to obey any orders given by or for Me with respect to any of My Accounts that has or have been subject to an attachment or sequestration in any legal proceeding against Me, and Robinhood shall be under no obligation to contest the validity of any such attachment or sequestration.

21.     **Event of Death.**  It is agreed that in the event of My death, the representative of My estate or the survivor or survivors shall immediately give Robinhood written notice thereof, and Robinhood may, before or after receiving such notice, take such proceedings, require such papers and inheritance or estate tax waivers, retain such portion of, or restrict transactions

in the Account as Robinhood may deem advisable to protect Robinhood against any tax, liability, penalty or loss under any present or future laws or otherwise. Notwithstanding the above, in the event of My death, all open orders shall be canceled, but Robinhood shall not be responsible for any action taken on such orders prior to the actual receipt of notice of death. Further, Robinhood may in Its discretion close out any or all of the Accounts without awaiting the appointment of a personal representative for My estate and without demand upon or notice to any such personal representative. The estate of any of the Account holders who have died shall be liable and each survivor shall continue to be liable, jointly and severally, to Robinhood for any net debit balance or loss in said account in any way resulting from the completion of transactions initiated prior to the receipt by Robinhood of the written notice of the death of the decedent or incurred in the liquidation of the Account or the adjustment of the interests of the respective parties, and for all other obligations pursuant to this Agreement. Such notice shall not affect Robinhood's rights under this Agreement to take any action that Robinhood could have taken if I had not died.

22. **Tax Reporting; Tax Withholding.** The proceeds of sale transactions and dividends paid will be reported to the Internal Revenue Service ("IRS") in accordance with applicable law.

A. <u>U.S. Persons</u>. This subsection is applicable if I am a U.S. person. Under penalties of perjury, I certify that the taxpayer identification number that I have provided or will provide to Robinhood (including any taxpayer identification number on any Form W-9 that I have provided or will provide to Robinhood) is My correct taxpayer identification number. I certify that I am not subject to backup withholding and I am a United States Person (including a U.S. resident alien) as such term is defined in section 7701(a)(30) of the Internal Revenue Code of 1986, as amended ("U.S. Person"). If a correct Taxpayer Identification Number is not provided Robinhood Financial, I understand I may be subject to backup withholding tax at the appropriate rate on all dividends, interest and gross proceeds paid to me. Backup withholding taxes are sent to the IRS and cannot be refunded by Robinhood Financial. I further understand that if I waive tax withholding and fail to pay sufficient estimated taxes to the IRS, I may be subject to tax penalties.

B. <u>Non-U.S. Persons</u>. This subsection is applicable if I am not a U.S. Person. I certify that I fully understand all the information on any Form W-8BEN that I have submitted or will submit to Robinhood. Under penalties of perjury, I declare that (i) I have examined all the information (including all the information in the English language) on any Form W-8BEN that I have submitted or will submit to Robinhood and (ii) to the best of My knowledge and belief all such information is true, correct, and complete. I authorize Robinhood to provide any such Form W-8BEN to Robinhood Securities or any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner. I agree that I will submit a new Form W-8BEN to Robinhood within 30 calendar days if any certification made on any previously submitted Form W-8BEN becomes incorrect. I understand that the IRS does not require My consent to any provisions of such Form W-8BEN other than the certifications required to establish My status as a non-U.S. Person and, if applicable, obtain a reduced rate of withholding.

18

23. **Equity Orders and Payment For Order Flow.**  SEC rules require all registered broker-dealers to disclose their policies regarding any "payment for order flow" arrangement in connection with the routing of customer orders.  "Payment for order flow" includes, among other things, any monetary payment, service, property, or other benefit that results in remuneration, compensation, or consideration to a broker-dealer from any broker-dealer in return for directing orders.  I understand that Robinhood transmits customer orders for execution to various exchanges or market centers based on a number of factors.  These include: size of order, trading characteristics of the security, favorable execution prices (including the opportunity for price improvement), access to reliable market data, availability of efficient automated transaction processing and reduced execution costs through price concessions from the market centers.  I further understand that certain of the exchanges or market centers may execute orders at prices superior to the publicly quoted market in accordance with their rules or practices and that while a customer may specify that an order be directed to a particular market center for execution, the order-routing policies, taking into consideration all of the factors listed above, are designed to result in favorable transaction processing for customers.  The nature and source of any payments or credits received by Robinhood in connection with any specific transactions will be furnished upon written request.

24. **Free Credit Balances and Sweep Service.**  If I enroll in Robinhood Financial Cash Management ("Cash Management"), I understand that I am electing to participate in the Insured Network Deposit ("IND") sweep service (the "Sweep Service").  Under the Sweep Service, free credit balances in My Account will be deposited into interest-bearing accounts at one or more banks ("Participating Depository Institutions"), in accordance with the Insured Network Deposit Sweep Program Disclosures ("IND Disclosures") available on the Website and in the App.  By enrolling in Cash Management, I represent and warrant that I have reviewed the IND Disclosures and agree to the terms set forth in the IND Disclosures.  If I am not enrolled in Cash Management, free credit balances in My Account will remain in My Account, will not earn interest and will not be eligible for FDIC insurance, but will be eligible for SIPC protection as described in the IND Disclosures.

25. **Fees and Charges.**  I understand that Robinhood does not charge fees or commissions for executing buy and sell orders.  However, I understand that other fees may apply.  The current fees are included in the fee schedule available in the App and on the Website.  I agree to pay any such fees at the then-prevailing rate.  I acknowledge that the prevailing fees may change and that change may occur without notice.  I agree to be bound by such changes once they are posted in the fee schedule available in the App and on the Website.  I also agree to pay all applicable federal, state, local, and foreign taxes.  I authorize Robinhood Financial to automatically debit My Account for any such fees and taxes.  I also agree to pay such expenses incurred by Robinhood in connection with collection of any unpaid balance due on My Accounts including attorney's fees allowed by law.

26. **ACH Transactions.**

    A.    Debit Transactions.

Robinhood will initiate an ACH debit at My request to debit funds from an account that I own at another financial institution ("External Account") for deposit into My Account.  I understand that in order for Robinhood to initiate an ACH debit, the financial institution holding my External Account must participate in the ACH system.  I understand that for the ACH transfers to be established, at least one common name must match exactly between My Account and My External Account. I authorize Robinhood to take such steps as it deems appropriate to verify my ownership of External Account, including by telling the bank at which such External Account is held that I have authorized and consented to such bank disclosing to Robinhood any information that Robinhood may request about Me or My External Account.  I also agree to cooperate with Robinhood's verification of my ownership of such External Account by promptly providing any identification and/or other documentation that Robinhood may request regarding such External Account.  I represent and warrant that there are sufficient funds in My External Account to cover the amount of the deposit to My Account.  Robinhood will initiate the ACH debit to My External Account on the Business Day or next Business Day after I request the transfer.  A transfer request will be deemed to have been made on a Business Day if it is received by Robinhood by 7:00 p.m. (Eastern Time) on such Business Day; if received after that time, the transfer request will be deemed to have been made on the next Business Day.

Within 60 days of the date of My ACH deposit, My funds may only be withdrawn to the External Account from which such funds were deposited.

I understand that an ACH debit transfer may be reversed or rejected if:  (A) there are insufficient funds in My External Account; (B) there is a duplicate transaction; (C) the transaction is denied by the bank holding My External Account; or (D) My External Account does not support ACH transfers.  I acknowledge that in the event of an ACH reversal, I will incur a fee.  Before initiating making an ACH debit transfer, I agree to check Robinhood Financial's most recent Commissions and Fees Schedule,                available              at              https://brokerage-static.s3.amazonaws.com/assets/robinhood/legal/RHF%20Retail%20Commisions%2 0and%20Fees%20Schedule.pdf.  I agree that I am solely liable and responsible for any ACH reversal fees that I incur.

B.    Credit Transactions.

Robinhood will initiate an ACH credit at My request to transfer funds from My Account to a recipient that I designate.  I agree that I will have sufficient funds ("Available Funds") in My Account to cover the amount of any ACH credit that I ask Robinhood to initiate.  Robinhood will debit the amount of such request from My Account on the Business Day or next Business Day after I request the transfer. A transfer request will be deemed to have been made on a Business Day if it is received by Robinhood by our cut-off time on such Business Day; if received after that time, the transfer request will be deemed to have been made on the next Business Day.

I agree that Robinhood may use any means which Robinhood, in its sole discretion, considers suitable to execute my ACH credit transfers.

**27.     Fractional Shares**

I acknowledge and understand that Robinhood rounds all holdings of fractional shares to the sixth decimal place, the value of fractional shares to the nearest cent, and any dividends paid on fractional shares to the nearest cent.  I further understand that Robinhood will not accept dollar-based purchases or sales of less than $1.00 and that I will receive proceeds from the sale of any whole or fractional shares rounded to the nearest cent.

I understand that a vendor employed by Robinhood will aggregate any proxy votes for fractional shares of Robinhood's customers with all votes reported to the issuer or issuer's designated vote tabulator and that, while Robinhood's vendor will report such proxy votes on fractional shares, the issuer or tabulator may not fully count such votes.

I understand that Robinhood will execute all orders that include fractional shares on a principal basis.  To the extent that Robinhood fulfills my order entirely out of its inventory and without purchasing or selling shares in the market, Robinhood will endeavor to price such shares or fractional shares at a price between the National Best Bid and Offer ("NBBO") at the time of the order for orders made during market hours, or, for such orders made during extended hours trading (9:00-9:30 a.m. and 4:00-6:00 p.m. Eastern), Robinhood will endeavor to price such orders between the best bid and offer at the time of the order, as reported by an external vendor.  Orders made outside market hours and extended hours trading are queued and fulfilled either at or near the beginning of extended hours trading (9:00 a.m. Eastern) or at or near market open (9:30 a.m. Eastern), according to my instructions.   To the extent that I trade fractional shares outside of market hours, these trades are subject to Robinhood's Extended Hours Trading                                   Disclosure,                        available                        at: https://cdn.robinhood.com/assets/robinhood/legal/ExtendedHoursTradingDisclosure.pdf

I understand Robinhood only accepts market orders for fractional shares at this time and does not permit limit orders for fractional shares.  I understand that fractional shares within My Account (i) are unrecognized, unmarketable, and illiquid outside the Robinhood platform, (ii) are not transferrable in-kind, and (iii) may only be liquidated and the proceeds transferred out via a wire transfer.  I acknowledge that, subject to applicable requirements, Robinhood may report holdings and transactions in My Account in terms of either U.S. Dollars, shares, or both.

**28.     Dividend Reinvestment Program**

Except as expressly stated otherwise, the provisions of this Section 28 will only apply if I am enrolled in Robinhood's Dividend Reinvestment Program ("DRIP").

My enrollment in the DRIP will be activated within three business days after I notify Robinhood of my intention to enroll an eligible security through the App. "Eligible security" means all shares available for fractional investing through Robinhood. I understand that in order to be eligible for dividend reinvestment, the securities must be held in My Account.

I may specify individual securities or have all Eligible securities in My Account enrolled for dividend reinvestment. If I choose to reinvest dividends from all Eligible securities, I understand that individual securities could subsequently no longer be Eligible securities at Robinhood's discretion or under applicable law. In those cases, only those securities will be discontinued from the DRIP. If I specify individual securities, I may add additional Eligible securities to the DRIP at any time if I hold a position in those securities. Enrollment with respect to these additional Eligible securities will be effective within three business days after Robinhood receives notification from me through the App. If I maintain open orders for securities I do not already hold, I may not enroll those securities for dividend reinvestment until my open orders are executed. If my entire Account is set up for dividend reinvestment, any eligible securities I purchase in the future will automatically participate in the DRIP.

All eligible cash distributions will be reinvested on all securities I have selected in the DRIP, provided that I owned the securities on the record date for determining shareholders eligible to receive dividends, and continue to hold the securities through payable date. "Eligible cash distributions" means most cash distributions, including regular and optional dividends, cash-in-lieu payments, and capital gains distributions. Special dividends, late ex-date, liquidation, and miscellaneous payments may not be eligible distributions. Optional dividends will be processed in accordance with dividend reinvestment instructions. If I have a margin account, Robinhood is permitted to borrow a dividend paying stock in the normal course of business and, as a result, in such situations instead of a dividend payment I may receive a cash in lieu payment. If I receive a cash in lieu payment, I authorize Robinhood to treat such payment as if it was not "in lieu" and reinvest it accordingly.

Robinhood will credit My Account upon completion of the dividend reinvestment. Robinhood will reinvest dividends on the business day following receipt of funds. In the rare instance in which Robinhood is unable to reinvest all dividends on the business day following receipt, it will reinvest the remaining funds as soon as reasonably possible thereafter, which may take up to five business days. I will not have use of the funds prior to reinvestment.

I understand that my participation in the DRIP is voluntary and that Robinhood has not made any recommendation that I should participate. I further understand that Robinhood is not recommending or offering any advice regarding the purchase of any security included as an Eligible security in the DRIP. I further understand that dividend reinvestment does not assure profits on my investments, nor does it protect against losses in declining markets.

I may terminate my participation in the DRIP, or the enrollment of individual securities in the DRIP, at any time by giving notice through the App. Termination will take effect prior to the next Eligible cash distribution provided my notice to terminate was received at least three business days prior to the record date of that distribution. I understand that my notice to terminate my participation in the DRIP will not affect any obligations that may result from transactions initiated prior to Robinhood's receipt and processing of my notice.

If I participate in the DRIP, I understand Robinhood will reinvest the dividends of a particular stock at or near the opening price on the trading day following receipt of the dividend. Robinhood will combine Eligible cash distributions from My Account with those from other Robinhood clients requesting dividend reinvestment in the same security and use these combined funds to purchase securities on my behalf and on behalf of these other clients. If the combined reinvested funds do not total the purchase price of at least one share, the distribution will be invested in fractional shares. On that same day, Robinhood will credit My Account with that number of shares, including fractional shares, equal to my Eligible cash distribution divided by the purchase price per share. Robinhood does not intend to charge a fee for transactions executed pursuant to the DRIP.

Dividend reinvestment may result in my owning interests in fractional shares of a security. I will be entitled to receive future dividend payments on my fractional shares, although other corporate actions may result in allocation of only whole shares and cash in lieu of fractions as determined by the issuer. In mandatory corporate reorganizations, my partial interest will be handled according to the specific terms of the reorganization. In voluntary corporate reorganizations, Robinhood will act on my instructions with respect only to my whole shares.

Because fractional share positions cannot be transferred, reorganized, or issued in certificate form, my partial interest will be liquidated, without commission charges to me, at prevailing market prices in the event My Account is transferred or closed, the stock is reorganized, or stock certificates are ordered out of My Account. The timing of such liquidations will be at the discretion of Robinhood.

Reinvestment of dividends may result in my owning a fractional share position in securities that are callable in part. In the event of a call, fractional shares to be called will be determined through a random selection process. The probability of my fractional share holdings being called will be proportional to the holdings of all Robinhood clients who own a fractional share position in that security. Prior to the publication date of such a call, I have the right to withdraw from My Account cash in lieu of my uncalled, fully paid partial holdings. Once a call is announced, however, all shares, whether registered or held in street name, participate in the random selection process. If my fractional shares are selected and I no longer hold the shares that I held on the publication date of the call, I will be responsible for covering those shares.

**29.   Cash Management Services.**

Except as expressly stated otherwise, the provisions of this Section 29 will only apply if I am enrolled in Cash Management.

A.   General.

I understand and agree that by enrolling in Cash Management, I am applying for a Robinhood-branded debit card issued by the bank identified in My Robinhood Debit Card Agreement ("Card").  I further understand and agree that by using My Card or exercising My electronic fund transfer ("EFT") privileges offered in connection with My Account, I authorize Robinhood to debit My Account immediately whenever an electronic draft or Card transaction is presented for payment on My behalf, when an EFT transaction is effected, or when any fee or charge is due (collectively "Payments").  I further understand and agree that when I request a Payment or withdrawal or instruct Robinhood to make a purchase of securities from My Account, Robinhood is authorized to place a block on the amount of the transaction ("Blocked Amounts") prior to the settlement date of the Payment, withdrawal or trade, and that the Blocked Amounts will not be available for use for additional Payments or the purchase of securities.  I agree to maintain Available Funds sufficient to pay for EFT transactions, Card transactions and withdrawals made by Me or any Authorized Card User (as defined below) and to pay for any securities trades and for interest on any margin loans and other transaction fees.  For this purpose, "Available Funds" in My Account will fluctuate daily and means the sum of (i) free credit balances, (ii) deposits to Participating Depository Institutions through the Sweep Service, and (iii) available margin loan value if My Account has margin privileges, minus (x) uncleared funds, (y) Blocked Amounts, and (z) deposits subject to a hold.  The loan value of eligible securities for the purpose of margin is subject to regulatory requirements and Robinhood credit policies then in effect.

B.   Payments and Withdrawals.

I agree that any Payments that I make from My Account will be lawful.  I agree that Payments will be deducted from the Available Funds in My Account in the following order: first, from free credit balances; second, by withdrawal of funds deposited to Participating Depository Institutions as part of the Sweep Service; and third, if My Account has margin privileges, from margin loans on the eligible securities in My margin Account.  Robinhood will debit My Account only up to an amount equal to the Available Funds.  I understand and agree that (i) if there are insufficient Available Funds in My Account to cover Payments when they become due, Robinhood has no obligation to make such Payments, and (ii) Robinhood has no obligation to make partial Payments.  Robinhood will not charge a fee with respect to any declined Payment for which there were insufficient Available Funds.  I acknowledge and agree, however, that Robinhood will not be responsible for any costs or losses that I may incur (including fees, costs, charges, attorneys' fees, investment losses, claims, demands, or liability resulting from any litigation or other actions) as a result of Robinhood's decision to decline any Payment or

withdrawal or other transaction because My Account has insufficient Available Funds.

I understand that if a Payment is funded by a margin loan, I will incur interest until the margin loan is repaid.

I agree that if my Available Funds at any time falls below zero, Robinhood may suspend Card and EFT privileges and terminate My Card.  If this occurs, I agree to immediately pay all amounts owed to Robinhood, including any purchases on My Card which will be immediately charged to My Account.

I acknowledge and agree that Robinhood reserves the right to decline any purchase or cancel My Card, and EFT privileges at any time for any reason with or without notice to Me.  If Robinhood decides to take such action, I understand and agree that I am responsible for any pending debits, which will be processed and deducted from My Account.

I understand that transactions will post to My Account in any order determined by Robinhood and that Robinhood may change that order without prior notice to Me. Robinhood will comply with requirements of applicable law regarding the order of posting transactions.

C.      Limitation of Liability.

I agree that, subject to any limitations imposed by applicable law, and except as otherwise set forth in this Agreement or in the disclosures contained in the Robinhood Debit Card Agreement, which has been provided to Me or made available to me in connection with the opening of My Account, neither Robinhood, any processing bank, nor the Card issuer will be liable for any loss I incur in connection with My Account, Card transactions, EFT transactions, or other features of My Account unless Robinhood is grossly negligent in fulfilling this Agreement. In no event will Robinhood, any processing bank, or the Card issuer be liable for consequential, special or indirect damages or losses unless applicable law requires otherwise.  I also agree that liability regarding online services or use of the App is further limited by the Robinhood Terms and Conditions, available at https://about.robinhood.com/legal/. To the extent I utilize online services or the App I acknowledge that I am bound by such Robinhood Terms and Conditions.

D.      Debit Cards.

I understand and agree that My use of the Card is subject to the terms, conditions and disclosures set forth in the Robinhood Debit Card Agreement, which has been provided to Me in connection with the opening of My Account and which I may access on the Website.

I understand and agree that I cannot request a Card for another person to use.  I agree, however, that if I permit another person to have access to use My Card or

Card number (an "Authorized Card User"), I am authorizing all Card transactions by such person and I agree that there are no limits to my authorization. I accept all liability with respect to the Card transactions effected by Me and any Authorized Card Users. I further agree that I may I may terminate the authority of an Authorized Card User only by contacting help@robinhood.com to cancel my Card. I agree that the cancellation of My Card is effective only after Robinhood has a reasonable period to act on My notice.

If My Card is cancelled, I agree to destroy, or if requested by Robinhood, return the Card to Robinhood. I acknowledge that I will be responsible for any Card transactions that are processed because of My failure to destroy or return the Card following cancellation.

If My Account includes margin privileges, I agree that transactions that exceed My free credit balances and deposits in the Sweep Service may result in margin credit being extended to My Account, for which I will be charged interest. I agree to review the Margin Disclosure Statement, which is available at https://about.robinhood.com/legal/.

E.    Deposits.

The provisions in this Section 29.E shall apply to My Account whether or not I am enrolled in Cash Management.

General; Holds. I understand that I may deposit funds to My Account by ACH, direct deposit or EFT (including deposits using the MoneySend service offered by Mastercard). I acknowledge and agree that funds that I deposit may be subject to one or more hold periods, which are described in the RHF Funds Availability schedule available at https://about.robinhood.com/legal/. I understand and agree that Robinhood reserves the right to modify the RHF Funds Availability schedule at any time by posting an updated schedule at https://about.robinhood.com/legal/, or otherwise providing notice to me. During the applicable hold period, My funds will not be available for ACH transfers, Card transactions, withdrawal, or the settling of securities transactions, in each case as described in the RHF Funds Availability schedule. I further understand and agree that Robinhood reserves the right to further delay making deposited funds available for periods longer than the hold periods specified in the RHF Funds Availability schedule to the extent Robinhood determines that additional time is needed to verify information about the item deposited or the sender or if Robinhood otherwise believes there is a risk of fraud or other unlawful activity with respect to My Account.

Mistaken Deposits. If funds are deposited or transferred into My Account by mistake or otherwise, I agree that Robinhood may correct the situation and deduct any interest paid by Participating Depository Institutions, if applicable, without prior notice to Me.

Returned Items.  I acknowledge and agree that I am responsible for returned transactions.  If I have funds transferred into My Account and that transfer is returned for any reason, Robinhood may charge the transfer and interest paid by Participating Depository Institutions, if applicable, against My Account, without prior notice to Me.  Robinhood may send the returned transfer back for collection a second time without notifying Me, and I waive notice of dishonor and protest.

F.    Electronic Fund Transfers.

The provisions in this Section 29.F relating to EFTs other than Card transactions shall apply to My Account whether or not I am enrolled in Cash Management.

I understand that My Account may be eligible for a variety of EFTs, which may be subject to separate agreements, terms and conditions.  These services may include use of the Card, and the "Move Money" functionality of the App.  I understand that I may be required to agree to separate terms and conditions governing the particular service I use to initiate EFTs.  In addition, I understand and agree that my use of EFT services are subject to the disclosures set forth in Appendix A (Electronic Fund Transfer Disclosures), and acknowledge that I have received and reviewed such disclosures.

G.    Security.

I agree to protect My Card, and My PINs, from access by anyone not authorized by Me to use them.  I acknowledge that I will be liable for all Card and online transactions conducted by anyone to whom I have given access or who has obtained access even if not authorized by Me, up to applicable legal limits.  I understand that I am responsible for reviewing My Account statement promptly to discover and report unauthorized activity, including use of My Card, Card number or PIN.  I agree to notify Robinhood as provided in Appendix A (Electronic Fund Transfer Disclosures) if I believe or have reason to believe that there has been unauthorized activity in My Account or that My Card, Card number or PIN has been lost, stolen or may be used by an unauthorized person.  Unless limited by law or as otherwise set forth in this Agreement or in the disclosures contained in Robinhood Debit Card Agreement, which is provided to Me as part of the Account opening process and is available on the Website, I agree that I will be responsible for losses that arise from My failure to (i) safeguard My Card and PINs, (ii) review My monthly statement for possible unauthorized activity and (iii) report any unauthorized activity to Robinhood as provided herein or in the Robinhood Debit Card Agreement.

H.    Disclosure of Information.

I agree and understand that all disclosures of My non-public personal information shall be made in accordance with the terms of this Agreement or the Robinhood Privacy Policy (available on the Website at https://about.robinhood.com/legal/), as applicable.  I agree that My consent to sharing non-public personal information will

remain in effect until I revoke such consent by updating My settings and visibility, which I may do at any time through the App.

In addition, I understand and agree that Robinhood may disclose information about My Account and My related activities to third parties under the following circumstances:

- As necessary to complete My Payment transactions;

- To investigate any complaint, disputed transaction, transaction inquiry or request I make or as necessary to investigate potential fraud or misuse related to My Account;

- To respond to requests from credit bureaus, creditors or other third parties for account-related information, to the extent such inquiries are necessary for processing My transactions or are usual and customary in the course of servicing similar products or accounts;

- As necessary to comply with any applicable law, government or court order or subpoena; or

- In accordance with My written permission or as otherwise permitted under the Robinhood Privacy Policy.

I.      Termination.

I understand that Robinhood may terminate my participation in Cash Management or in specific features of Cash Management for any reason, upon notice to me.

**30.     Consent to Redeem Shares.**

I understand and agree that whenever it is necessary for Robinhood's protection or to satisfy a margin call, deficiency, debit or other obligation owed to Robinhood, Robinhood may (but is not required to) sell, assign and deliver all or any part of the securities in My Account, or close any or all transactions in My Account.  I understand that Robinhood may, but is not obligated to, attempt to contact Me before taking any such action.  I understand and agree that Robinhood reserves the right to take any such action without prior notice or demand for additional collateral, and free of any right of redemption, and that any prior demand, call or notice will not be considered a waiver of our right to sell or buy without demand, call or notice.

I further understand that Robinhood may choose which securities to buy or sell, which transactions to close, and the sequence and timing of liquidation, and may take such actions on whatever exchange or market and in whatever manner (including public auction or private sale) that Robinhood chooses in the exercise of

28

its business judgment.  I agree not to hold Robinhood liable for the choice of which securities to buy or sell or of which transactions to close or for the timing or manner of the liquidation.  I also agree not to hold Robinhood liable for taking such action.

I understand and agree that Robinhood is entitled to exercise the rights described in this section in its sole discretion, including, but not limited to, whenever any of the following occurs:

- The equity level in My Account falls below required minimums;

- Sufficient funds or securities are not deposited to pay for transactions in My Account;

- I reverse any ACH debit transfer to My Account;

- A petition of bankruptcy or for the appointment of a receiver is filed by or against Me;

- An attachment is levied against My Account;

- I die or become incapacitated or incompetent; or

- My Account is closed.

31. **Electronic Delivery of Trade and Account Information; Notice.**  All communications, notices, legal disclosures, and other materials related to My Account or this Agreement, including account statements, trade confirmations, margin calls, notices, disclosures, regulatory communications and other information, documents, data and records regarding My Account (the "Communications"), or an alert that any such Communication has been posted to the secure section of the Website or the App, and is available for viewing, may be sent to Me at the mailing address for My Account or the e-mail address that I have given to Robinhood in My account application  or at such other address as I may hereafter give Robinhood in writing or by e-mail at least ten (10) calendar days prior to delivery, and all communications so sent, whether in writing or otherwise, shall be deemed given to Me personally, whether actually received or not.

32. **API.**

   A.   <u>Overview; Definitions</u>.  Robinhood may, in Robinhood's sole discretion, provide third parties with an application programming interface and other materials in accordance with any accompanying documentation (collectively, the "API Package") (such third parties, "API Licensees"), to make available certain features and functionality of Robinhood's mobile applications, websites, or technology platform via the API Licensees' products (such products, the "Licensee Products"). The API Package and the Licensee Products are collectively referred to as the "API Products".  "Personal Information" means My personally identifiable information

(including username, logon password, financial information, trade data, and other financial information) and all data exchanged between Robinhood and the API Products.

B.      Access to My Personal Information.  Through My use of any API Products, I may be providing API Licensees with access to My Account and Personal Information. By using any API Products, I acknowledge that such API Products may employ security, policies, procedures and systems of API Licensees which may or may not be less stringent and secure than Robinhood's policies, procedures and systems.  I agree that My use of any API Products shall be subject to the terms and conditions of this Agreement, in addition to any other agreements which I executed with respect to any such API Products.   I understand and agree that any end user agreement that I executed with any API Licensee is concluded between Me and such API Licensee only, and not with Robinhood; and such API Licensee, not Robinhood, is solely responsible for such Licensee Product and the content thereof. I understand and agree that the API Products may deliver Personal Information to Robinhood, and that Robinhood is authorized to receive and store such Personal Information consistent with Robinhood's then-in-effect policies and procedures. Further, I agree that the API Products may request Personal Information stored by Robinhood, and I consent to Robinhood's disclosure of such Personal Information to the API Products.

C.      No Recommendations.  To the extent the Licensee Products or API Licensees express opinions or make recommendations, I understand that such opinions and recommendations are expressed solely by API Licensees and are not the opinions or recommendations of Robinhood.   The existence of the API Products and Robinhood's consent to any connectivity between any Licensee Products and Robinhood's technology, the App, the Website, or trading platform(s) does not constitute (i) any recommendation by Robinhood to invest in any security or utilize any investment strategy; or (ii) any representation, warranty, or other guarantee by Robinhood as to the present or future value or suitability of any sale, trade, or other transaction involving any particular security or any other investments.   The existence of any and all information, tools and services provided by API Licensees or by the Licensee Products shall not constitute Robinhood's endorsement of API Licensees or the Licensee Products.

D.      Data Provided by Robinhood to API.  From time to time, and subject to then-in-effect agreements between Robinhood and API Licensees, Robinhood may, in its own discretion, make market data feeds received from third parties available via the API Products.  Robinhood does not make any guarantees in regard to such market data feeds.  Furthermore, API Licensees or Licensee Products may make available to Me market data feeds independent of Robinhood.  I am aware that from time to time that there may be discrepancy between the market data presented on the App or Website and information provided by any API Products due to a variety of reasons, including the time to update and transmit such data to a mobile application or website and latency caused by such API Product's or My local environment (such as computer set up, connection speed, etc.).  Robinhood is not

responsible for the accuracy of any market data displayed on any API Products or otherwise made available by API Licensees.

E.   Risks; No Liability.  I acknowledge that there may be latency between the time an order (or other Personal Information) is submitted from the API Products and the time such order or Personal Information is received by Robinhood.  Latency may also affect order modification and order cancellation requests.  The time an order or a request is actually received by Robinhood (including for execution) will be the official time, including for the purposes of routing the order to the market for execution.  In addition, all orders submitted to Robinhood are subject to order vetting by Robinhood.  Orders created and submitted through any API Products are not vetted until they are received by Robinhood.  It is possible that Robinhood may reject an order placed through any API Products.  Robinhood cannot guarantee that any order will be accepted when such order is routed to the market for execution, and Robinhood cannot guarantee that notifications and Personal Information provided to Me by Robinhood will be successfully delivered to or displayed by any API Products.

Without limiting the generality of any other terms in this Agreement, I agree that:

(i)      Robinhood or its Affiliates shall not be liable for any Losses as a result of any issues addressed in this Section 32 of this Agreement, nor shall Robinhood or its Affiliates be liable for any Losses realized for technical issues involving any API Products or API Licensee technology or product offerings (including system outages or downtime).

(ii)     Robinhood or its Affiliates shall not be responsible for any investment research provided by any API Licensee or any Licensee Products.

(iii)    Robinhood or its Affiliates makes no representations, warranties or other guarantees as to the accuracy, timeliness or efficacy of any market data, information, or other functionality made available by any API Licensee or any API Products.

F.   Intellectual Property.  My use of any API Products will not confer to Me any title, ownership interest or intellectual property rights that otherwise belongs to Robinhood or any of its affiliates.  The API Package, including content, is protected under U.S. patent, copyright laws, international treaties or conventions, and other laws and will remain Robinhood's exclusive property, as applicable.  Names, logos, and all related product and service names, design marks, and slogans displayed by or relating to Robinhood or any of its Affiliates or API Licensees in the context of the API Products shall remain the property of the respective owner, and use of such property by Robinhood or any API Licensee in marketing or provision of any API Products does not grant ownership of or entitle Me to use any such name or mark in any manner.

G.   User's Representations and Warranties.  I represent and warrant that:

31

(i)     By virtue of utilizing any API Products, I consent to and accept any risk associated with Robinhood's sharing of Personal Information with any API Licensee and shall not hold Robinhood, its Affiliates, or their respective officers, directors, or employees responsible for any Losses resulting from the sharing of such Personal Information.

(ii)     I agree that My use of any API Products or API Licensee's content, information, technology, or functionality is at My own risk.

(iii)     I agree that Robinhood may revoke any API Licensee or API Products' authorization at any time, for any reason, with or without cause and without prior notice to Me.

33.     **Electronic Signatures; Modifications to the Agreement.**  I agree to transact business with Robinhood electronically.  By electronically signing an application for an Account, I acknowledge and agree that such electronic signature is valid evidence of My consent to be legally bound by this Agreement and such subsequent terms as may govern the use of Robinhood's services.  The use of an electronic version of any document fully satisfies any requirement that the document be provided to Me in writing.  I accept notice by electronic means as reasonable and proper notice, for the purpose of any and all laws, rules and regulations.  I acknowledge and agree that Robinhood Financial may modify this Agreement from time to time and I agree to consult the Website from time to time for the most up-to-date Agreement.  The electronically stored copy of this Agreement is considered to be the true, complete, valid, authentic and enforceable record of the Agreement, admissible in judicial or administrative proceedings to the same extent as if the documents and records were originally generated and maintained in printed form.  I agree to not contest the admissibility or enforceability of Robinhood Financial's electronically stored copy of the Agreement.

34.     **Margin Accounts.**

A.     <u>Election</u>.  This numbered section applies to my account to the extent I elect and am approved for a Robinhood Gold margin account.

B.     <u>Margin Trading</u>.  I understand that margin trading involves interest charges and risks, including the potential to lose more than deposited or the need to deposit additional collateral in a falling market.  Before using margin, customers must determine whether this type of trading strategy is right for them given their specific investment objectives, experience, risk tolerance, and financial situation.  If I have elected to have a margin Account, I represent that I have read the <u>Margin Disclosure Statement</u>, <u>Day Trading Risk Disclosure</u>, and <u>FINRA Investor Information</u>.  These disclosures contain information on Robinhood's lending policies, interest charges, and the risks associated with margin accounts.

C.     <u>Hypothecation</u>.  Within the limitations imposed by applicable laws, rules and regulations, all securities now or hereafter held by Robinhood, or carried by Robinhood in any account for Me (either individually or jointly with others), or

deposited to secure same, may from time to time, without any notice, be carried in your general loans and may be pledged, repledged, hypothecated or re-hypothecated, separately or in common with other securities for the sum due to you thereon or for a greater sum and without retaining in your possession or control for delivery a like amount of similar securities. The IRS requires Broker Dealers to treat dividend payments on loaned securities positions as payments received in lieu of dividends for 1099 tax reporting purposes. Taxation of substitute dividend payments may be greater than ordinary on qualified dividends. It is understood, however, that you agree to deliver to Me upon My demand and upon payment of the full amount due thereon, all securities in such accounts, but without obligation to deliver the same certificates or securities deposited by Me originally. Any securities in My margin or short account may be borrowed by you, or lent to others.

D.   Interest.  Debit balances in My Accounts shall be charged with interest in accordance with your established custom, as disclosed to Me in the Customer Information Brochure pursuant to the provisions of the Securities Exchange Act.

E.   Margin.  I agree to maintain in all accounts with Robinhood such positions and margins as required by all applicable statutes, rules, regulations, procedures and custom, or as you deem necessary or advisable. I agree to promptly satisfy all margin and maintenance calls.

F.   Sales.  I agree to specifically designate any order to sell a security, which I do not own as a short sale, and understands that Robinhood will mark such order as a short sale. I agree that any order which is not specifically designated as a short sale is a sale of securities owned by me, and that I will deliver the securities on or before settlement date, if not already in the account. If I should fail to make such delivery in the time required, Robinhood is authorized to borrow such securities as necessary to make delivery for the sale, and I agree to be responsible for any loss you may thereby sustain, or which you may sustain as a result of your inability to borrow such securities.

**35.   Consent to Electronic Delivery of Documents.**

A.   Consent.  **By agreeing to electronic delivery, I am giving My informed consent to electronic delivery of all Account Documents, as defined below, other than those I have specifically requested to be delivered in paper form**.  "Account Documents" include notices, disclosures, current and future account statements, regulatory communications (such as prospectuses, proxy solicitations, and privacy notices), trade confirmations, tax-related documents, and any other information, documents, data, and records regarding My Account, this Agreement (including amendments to this Agreement), and the agreements and disclosures governing the services delivered or provided to Me by Robinhood Financial, the issuers of the securities or other property in which I invest, and any other parties. I agree that I can access, view, download, save, and print any Account Documents I receive via electronic delivery for My records.

B.  <u>Electronic Delivery System</u>.  I acknowledge that Robinhood's primary methods of communication with Me include (A) posting information on the Website, (B) providing information via the App, (C) sending email(s) to My email address of record, and, to the extent required by law, (D) providing Me with notice(s) that will direct Me to the App or the Website where I can read and print such information. Unless otherwise required by law, Robinhood reserves the right to post Account Documents on the Website without providing notice to Me.  Further, Robinhood reserves the right to send Account Documents to My postal or email address of record, or via the App or Website.  I agree that all Account Documents provided to Me in any of the foregoing manner is considered delivered to Me personally when sent or posted by Robinhood, whether I receive it or not.

All e-mail notifications regarding Account Documents will be sent to My e-mail address of record.  I agree to maintain the e-mail address that I have provided Robinhood until I provide Robinhood with a new one.  I understand that e-mail messages may fail to transmit promptly or properly, including being delivered to SPAM folders.  I further understand that it is My sole responsibility to ensure that any emails from Robinhood or its Affiliates are not marked as SPAM.  Regardless of whether or not I receive an e-mail notification, I agree to check the Website regularly to avoid missing any information, including time-sensitive or otherwise important communication. If I authorize someone else to access the e-mail account I have provided Robinhood, I agree to tell them to share the Account Documents with Me promptly, and I accept the risk that they will see My sensitive information. I understand that if I use a work e-mail address or computing or communications device, My employer or other employees may have access to the Account Documents.

Additionally, I acknowledge that the Internet is not a secure network and agree that I will not send any confidential information, including Account numbers or passwords, in any unencrypted e-mails.  I also understand that communications transmitted over the Internet may be accessed by unauthorized or unintended third parties and agree to hold Robinhood, its Affiliates, and Robinhood and its Affiliates' respective officers and employees harmless for any such access regardless of the cause.

I agree to promptly and carefully review all Account Documents when they are delivered and notify Robinhood Financial in writing within five (5) calendar days of delivery if I object to the information provided (or other such time specified herein).  If I fail to object in writing within such time, Robinhood Financial is entitled to treat such information as accurate and conclusive.  I will contact Robinhood to report any problems with accessing the Account Documents.

C.  <u>Costs</u>.  Potential costs associated with electronic delivery of Account Documents may include charges from Internet access providers and telephone companies, and I agree to bear these costs.  Robinhood Financial will not charge Me additional online access fees for receiving electronic delivery of Account Documents.

D.   <u>Archival</u>.  Upon My request, I may obtain copies of up to six (6) prior years of account statements, and three (3) prior years of trade confirmations.

E.   <u>Revocation of Consent</u>.  Subject to the terms of this Agreement, I may revoke or restrict My consent to electronic delivery of Account Documents at any time by notifying Robinhood Financial in writing of My intention to do so.  I also understand that I have the right to request paper delivery of any Account Document that the law requires Robinhood Financial to provide Me in paper form.  Robinhood Financial will not treat My request for paper copies as a withdrawal of My consent to electronic delivery of Account Documents.  I understand that if I revoke or restrict My consent to electronic delivery of Account Documents or request paper delivery of same, Robinhood Financial, in its sole discretion, may charge Me a reasonable service fee for the delivery of any Account Document that would otherwise be delivered to Me electronically, restrict or close My account, or terminate My access to Robinhood Financial's services.  I understand that neither My revocation or restriction of consent, My request for paper delivery, nor Robinhood Financial's delivery of paper copies of Account Documents will affect the legal effectiveness or validity of any electronic communication provided while My consent was in effect.

F.   <u>Duration of Consent</u>.  My consent to receive electronic delivery of Account Documents will be effective immediately and will remain in effect unless and until either I or Robinhood Financial revokes it.  I understand that it may take up to three (3) Business Days to process a revocation of consent to electronic delivery, and that I may receive electronic notifications until such consent is processed.

G.   <u>Hardware and Software Requirements</u>.  I understand that in order to receive electronic deliveries, I must have access to a computer or Mobile Device with Internet access, a valid e-mail address, and the ability to download such applications as Robinhood Financial may specify and to which I have access.  I also understand that if I wish to download, print, or save any information I wish to retain, I must have access to a printer or other device in order to do so.

H.   <u>Consent and Representations</u>.  I hereby agree that I have carefully read the above information regarding informed consent to electronic delivery and fully understand the implications thereof.  Additionally, I hereby agree to all conditions outlined above with respect to electronic delivery of any Account Document.  I will maintain a valid e-mail address and continue to have access to the Internet.  If My e-mail address changes, I agree to immediately notify Robinhood Financial of My new e-mail address in writing.

36.   **Miscellaneous Provisions.**  The following provisions shall also govern this Agreement:

A.   <u>Contact Information</u>.  Robinhood Customer Service may be contacted by visiting support.robinhood.com or by email at help@robinhood.com.

B.   <u>Interpretation</u>.  The heading of each provision hereof is for descriptive purposes only and shall not be (1) deemed to modify or qualify any of the rights or obligations set forth herein or (2) used to construe or interpret any of the provisions hereunder. When a reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The word "or," when used in this Agreement, has the inclusive meaning represented by the phrase "and/or." Unless the context of this Agreement otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively; and (ii) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to this entire Agreement.  References to any law shall be deemed to refer to such law as amended from time to time and to any rules or regulations promulgated thereunder.

C.   <u>Binding Effect; Assignment</u>.  This Agreement shall bind My heirs, assigns, executors, successors, conservators and administrators.  I may not assign this Agreement or any rights or obligations under this Agreement without first obtaining Robinhood's prior written consent.  Robinhood may assign, sell, or transfer My Account and this Agreement, or any portion thereof, at any time, without My prior consent.

D.   <u>Severability</u>.  If any provisions or conditions of this Agreement are or become inconsistent with any present or future law, rule, or regulation of any applicable government, regulatory or self-regulatory agency or body, or are deemed invalid or unenforceable by any court of competent jurisdiction, such provisions shall be deemed rescinded or modified, to the extent permitted by applicable law, to make this Agreement in compliance with such law, rule or regulation, or to be valid and enforceable, but in all other respects, this Agreement shall continue in full force and effect.

E.   <u>Website Postings</u>.  I agree and understand that Robinhood Financial may post other specific agreements, disclosures, policies, procedures, terms, and conditions that apply to My use of the App, the Website, or My Account on the Website ("Website Postings").  I understand that it is My continuing obligation to understand the terms of the Website Postings, and I agree to be bound by the Web Postings as are in effect at the time of My use.

F.   <u>Entirety of Agreement</u>.  This Agreement, any attachments hereto, other agreements and policies referred to in this Agreement (including the Website Postings), and the terms and conditions contained in My Account statements and confirmations, contain the entire agreement between Robinhood and Me and supersede all prior or contemporaneous communications and proposals, whether electronic, oral, or written, between Robinhood and Me, provided, however, that any and all other agreements between Robinhood and Me, not inconsistent with this Agreement, will remain in full force and effect.

G.    <u>Amendment</u>.  Robinhood may at any time amend this Agreement without prior notice to Me.  The current version of the Agreement will be posted on the Website and My continued Account activity after such amendment constitutes My agreement to be bound by all then-in-effect amendments to the Agreement, regardless of whether I have actually reviewed them.  Continued use of the App, the Website or any other Robinhood Financial services after such posting will constitute My acknowledgment and acceptance of such amendment.  I agree to regularly consult the Website for up-to-date information about Robinhood Financial services and any modifications to this Agreement.  Robinhood is not bound by any verbal statements that seek to amend the Agreement.

H.    <u>Termination</u>.  Robinhood may terminate this Agreement, or close, deactivate, or block access to My Account at any time in its sole discretion.  I will remain liable to Robinhood for all obligations incurred in My Account, pursuant to this Agreement, or otherwise, whether arising before or after termination.  I may terminate this Agreement after paying any obligations owed upon written notice.  This Agreement survives termination of My Account.

I.    <u>No Waiver; Cumulative Nature of Rights and Remedies</u>.  I understand that Robinhood's failure to insist at any time upon strict compliance with any term contained in this Agreement, or any delay or failure on Robinhood's part to exercise any power or right given to Robinhood in this Agreement, or a continued course of such conduct on Robinhood's part, shall at no time operate as a waiver of such power or right, nor shall any single or partial exercise preclude any other further exercise.  All rights and remedies given to Robinhood in this Agreement are cumulative and not exclusive of any other rights or remedies to which Robinhood is entitled.

J.    <u>International Customers</u>.  The products and services described on the Website are offered only in jurisdictions where they may be legally offered.  Neither the Website nor the App shall be considered a solicitation for or offering of any investment product or service to any person in any jurisdiction where such solicitation or offering would be illegal.  I understand that Robinhood, in its sole discretion, may accept unsolicited accounts from non-U.S. residents, depending on the country of residence and other factors.  I understand that Robinhood is based in the United States and that Robinhood accepts only U.S. currency in Robinhood's customer accounts.

K.    <u>Governing Law</u>.  This Agreement and all transactions made in My Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof), except to the extent governed by the federal securities laws, FINRA Rules, and the regulations, customs and usage of the exchanges or market (and its clearing house) on which transactions are executed.

37.    Arbitration.

> **A.    This Agreement contains a pre-dispute arbitration clause.  By signing an arbitration agreement, the parties agree as follows:**
>
> **(1)    All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**
>
> **(2)    Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.**
>
> **(3)    The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.**
>
> **(4)    The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.**
>
> **(5)    The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**
>
> **(6)    The rules of some arbitration forums may impose time limits for bringing a claim in arbitration.  In some cases, a claim that is ineligible for arbitration may be brought in court.**
>
> **(7)    The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.**
>
> **B.    Any controversy or claim arising out of or relating to this Agreement, any other agreement between Me and Robinhood, any Account(s) established hereunder, any transaction therein, shall be settled by arbitration in accordance with the rules of FINRA Dispute Resolution, Inc. ("FINRA DR").  I agree to arbitrate any controversy or claim before FINRA DR in the State of California.**
>
> **C.    This agreement to arbitrate constitutes a waiver of the right to seek a judicial forum unless such a waiver would be void under the federal securities laws. If I am a foreign national, non-resident alien, or if I do not reside in the United States, I agree to waive My right to file an action against Robinhood in any foreign venue.**
>
> **D.    No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until:**
>
> **(1)    the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court.  Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.**

ACCEPTED AND AGREED:  I acknowledge that I have read the preceding terms and conditions of this Agreement, that I understand them and that I hereby manifest my assent to, and my

agreement to comply with, those terms and conditions by accepting this agreement.  **I ALSO UNDERSTAND THAT BY ACCEPTING THIS AGREEMENT I HAVE ACKNOWLEDGED THAT THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE IN SECTION 37 HEREIN.  I ALSO AGREE (1) THAT ANY OF MY MARGIN ACCOUNT SECURITIES MAY BE BORROWED BY ROBINHOOD OR LOANED TO OTHERS; (2) I HAVE RECEIVED OF A COPY OF THIS AGREEMENT AND (3) I HAVE REVIEWED A COPY OF THE MARGIN DISCLOSURE STATEMENT.**

**Appendix A**

**Electronic Fund Transfer Services Disclosures**

The following disclosures apply to the use of any EFT services offered by Robinhood, including the Card, ACH transactions and the Move Money functionality of the App.

Solely for purposes of these disclosures:  (i) references to the Bank shall include any financial institution that issues the Card or provides services in connection with ACH, Move Money or other EFT transactions; (ii) "you" and "your" mean the owner of the Account; and (iii) "we" and "us" means Robinhood and the Bank collectively.

1.      Your Liability.

Contact Robinhood Customer Service AT ONCE if you believe your Card or PIN has been lost or stolen or if you believe that an electronic fund transfer has been made without your permission. Telephoning is the best way of keeping your losses down.  You could lose all the Available Funds in your Account (plus your maximum overdraft line of credit).  If you tell Robinhood within 2 business days after you learn of the loss or theft of your Card or PIN, you can lose no more than $50 if someone used your Card or PIN without your permission.

If you do NOT tell Robinhood within 2 business days after you learn of the loss or theft of your Card or PIN, and Robinhood can prove that it could have stopped someone from using your Card or PIN without your permission if you had told Robinhood, you could lose as much as $500.

Also, if your statement shows transfers that you did not make, including those made by Card or using your PIN, tell Robinhood at once.  If you do not tell Robinhood within sixty (60) days after the statement was mailed to you, or otherwise made available to you, you may not get back any money you lost after the sixty (60) days if Robinhood can prove that Robinhood could have stopped someone from taking the money if you had told Robinhood in time.  If a good reason (such as a long trip or a hospital stay) kept you from telling Robinhood, Robinhood will extend the time periods.

2.      Contact in event of unauthorized transfer.

If you believe your Card or PIN has been lost or stolen, contact Robinhood by emailing help@robinhood.com.

3.      Business Days.

Business Days are Monday through Friday, excluding federal holidays.

4.      Transfer Types and Limitations.

You may use your Card to make purchases at any merchant that accepts Mastercard debit cards or debit cards of other networks in which the Bank participates, and to make ATM withdrawals, in each case subject to the Available Funds in your Account, the transaction limits described below, and the other terms and conditions of this Agreement.  You acknowledge and agree that the value

40

available to you for use with the Card is limited to the Available Funds in your Account. So long as you do not exceed the Available Funds in your Account, you may use the Card to purchase goods or services wherever the Card is honored, and to obtain cash by initiating cash withdrawal transactions through the Card from any financial institution or ATM that accepts the Card.  Each time you use the Card, you authorize Robinhood to reduce the Available Funds in your Account by the amount of the purchase or withdrawal and any applicable fees, costs, or holdings. Nevertheless, if you exceed the Available Funds in your Account you shall remain fully liable to Robinhood for the amount of the transactions and any applicable fees and charges.

You may also make ACH withdrawals from your Account, either originated through Robinhood or originated by a third party (a "non-originated" withdrawal), subject to the Available Funds in your Account, the transaction limits described below, and the other terms and conditions of this Agreement.  You also may make ACH deposits to your Account, either originated through Robinhood or originated by a third party (a "non-originated" deposit), subject to the transaction limits described below.

There are limits on the dollar amount of transactions you can make with your Card each day and each month, and limits on the amount of ACH withdrawals and deposits you can make each day. The following lists the limits for each type of transaction:

| Transaction Type | Daily Limit | Weekly Limit | Monthly Limit |
|---|---|---|---|
| Originated ACH Withdrawals | $50,000.00 | N/A | N/A |
| Originated ACH Deposits | $50,000.00 | N/A | N/A |
| Non-Originated ACH Withdrawals | $250,000.00 | N/A | N/A |
| Non-Originated ACH Deposits | $250,000.00 | N/A | N/A |
| Point of Sale Purchases with the Card | $5,000.00 | N/A | $15,000.00 |
| ATM Withdrawals | $510.00 | | $5,000.00 |
| MoneySend Deposits | N/A, subject to the Weekly Limit | $2,999 | N/A |

5.      Fees.

41

We will not charge you any fees for use of ATMs that are part of the AllPoint or MoneyPass ATM networks, or for point of sale transactions using the Card, or for initiating other EFTs on your behalf.  If you withdraw funds from ATMs outside of the AllPoint or MoneyPass ATM networks, you may be separately assessed fees by those ATM owners or operators.

6.      <u>Confidentiality</u>.

We may disclose information to third parties about you, your Card, or the transactions you make using any of the EFT services we provide:

(1)      Where it is necessary or helpful for completing or correcting transactions and resolving claims regarding transactions;

(2)      In order to verify the existence and condition of your Card or your Account for a third party, such as a merchant;

(3)      In order to comply with a valid request by a government agency, a court order, or other legal or administrative reporting requirements;

(4)      If you consent by giving us your written permission;

(5)      To our employees, auditors, affiliates, service providers, or attorneys as needed;

(6)      In order to prevent, investigate or report possible illegal activity;

(7)      In order to issue authorizations for transactions on the Card;

(8)      As permitted by applicable law; or

(9)      Otherwise as necessary to fulfill our obligations under this Agreement and the terms applicable to the EFT service you are using.

Please see Robinhood's privacy policy, available at about.robinhood.com/legal, and the applicable Bank's privacy policy, available at https://www.suttonbank.com/_/kcms-doc/85/49033/WK-Privacy-Disclosure-1218.pdf, for further details.   (The Robinhood privacy policy and the applicable Bank's privacy policy are referred to collectively as the "Privacy Policies").   You hereby agree to Robinhood's and the Bank's collection, use and sharing of information about you and the Card as provided in the Privacy Policies, which are made a part of this Agreement. The Privacy Policies also tell you how you can (i) limit the ways in which Bank and Robinhood share information about you, or (ii) request corrections to the information that Bank or Robinhood maintain about you.  You agree that information you provide in connection with your Card or other EFT services you use is being provided directly to both Robinhood as the holder of the Account associated with the service and the Bank as the Card issuer or provider of the EFT service, as applicable.

7.    <u>Documentation</u>.

*Terminal Transfers*.  You can get a receipt at the time you make any transfer to or from your Account using an ATM from the AllPoint or MoneyPass ATM networks or at the point of sale.

*Preauthorized Credits*.  If you have arranged to have direct deposits made to your Account at least once every 60 days from the same person or company, the person or company making the deposit will tell you every time they send us the money.  You can also check your Account online to see if a deposit has been received.

*Periodic Statements*.  You will get a monthly Account statement, unless there are no transfers in a particular month.  In any case you will get the statement at least quarterly.  You may obtain information about the Available Funds in your Account and a history of your Cash Management transactions on the App.

8.    <u>Preauthorized Payments/Stop Payment Procedure and Notice of Varying Amounts</u>.

You do not have the right to request that Robinhood in advance make regular payments out of your Account, although you may ask third parties to initiate regular payments out of your Account.

a. *Right to stop payment*: If you have automatic recurring payments taken out of your Account, you can stop any of these payments by contacting us at help@robinhood.com.  You must contact us in time for us to receive your request at least three business days before the payment is scheduled to be made.

b. *Notice of varying amounts*: If these regular payments vary in amount, the party you are going to pay will tell you, 10 days before each payment, when the payment will be made and how much it will be.  (The party you are going to pay may allow you to choose to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)

c. *Liability for failure to stop payment of preauthorized transfer*: If you order us to stop a payment at least three business days before the transfer is scheduled and we do not do so, we will be liable for your losses or damages.

9.    <u>Our Liability</u>.

If we do not complete a transaction to or from your Account on time or in the correct amount according to our Agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

(1)    If through no fault of Robinhood or the Bank, you do not have enough Available Funds in your Account to complete the transaction;

(2)    If a merchant refuses to accept your Card;

(3)    If an electronic terminal where you are making a transaction does not operate properly, and you knew about the problem when you initiated the transaction;

43

(4)     If access to your Card has been blocked after you reported your Card lost or stolen;

(5)     If there is a hold or your funds are subject to legal or administrative process or other encumbrance restricting their use;

(6)     If Robinhood or the Bank have reason to believe the requested transaction is unauthorized;

(7)     If circumstances beyond the control of Robinhood or the Bank (such as fire, flood, or computer or communication failure) prevent the completion of the transaction, despite reasonable precautions that Robinhood or the Bank have taken; or

(8)     For any other exception stated in this Agreement with you or by applicable law.

10.     Errors or Questions About Electronic Transfers.

In case of errors or questions about your electronic transfers, including your Card transactions, or if you think your statement or receipt is wrong or if you need more information about a transaction listed on the statement or receipt, contact Robinhood by emailing help@robinhood.com. Robinhood must hear from you no later than sixty (60) days after you were sent the FIRST statement on which the problem or error appeared.

(a) Tell Robinhood your name and account number.

(b) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

(c) Tell Robinhood the dollar amount of the suspected error.

Robinhood will determine whether an error occurred within ten (10) business days after Robinhood hears from you and will correct any error promptly.  If Robinhood needs more time, however, it may take up to forty-five (45) days to investigate your complaint or question.  If Robinhood decides to do this, Robinhood will credit your Account within ten (10) business days for the amount you think is in error, so that you will have the use of the money during the time it takes Robinhood to complete our investigation.

For errors involving new accounts, point of sale, or foreign initiated transactions, Robinhood may take up to ninety (90) days to investigate your complaint or question.  For new accounts, Robinhood may take up to twenty (20) business days to credit your Account for the amount you think is in error.

Robinhood will tell you the results of our investigation within three (3) business days after completing the investigation. If Robinhood decides that there was no error, Robinhood will send you a written explanation. You may ask for copies of the documents that Robinhood used in our investigation.